## W. L. BURNETT V. STATE

No. 27,568. May 11, 1955
Motion for Rehearing Denied
(Without Written Opinion) June 15, 1955

*Martin & Bailey* and *Samuel E. Daugherty*, Dallas, for appellant.

*Henry Wade*, Criminal District Attorney, *Fred Bruner, Harvey Lindsay, Jerry Shivers* and *Charles S. Potts*, Assistants Criminal District Attorney and *Leon Douglas*, State's Attorney, Austin, for the state.

DICE, Judge.

The conviction is for murder with malice; the punishment assessed being confinement in the penitentiary for 40 years.

The evidence discloses that appellant shot and killed the deceased, Dr. Jack W. Sharp, during a quarrel at the home of Mrs. Nona Bird in the city of Dallas, Dallas County, Texas, on the night of July 27, 1954.

The testimony shows that Dr. Sharp was Mrs. Bird's physician and in such capacity made professional visits to her home; that appellant was a painter, and in April, 1954, became acquainted with Mrs. Bird while doing some work at her house. The acquaintance became quite intimate between the two, and according to the appellant's testimonly, he moved into her home in May, when he began sleeping and taking his meals there; and thereafter he and Mrs. Bird agreed to be married and discussed the proposed marriage with others.

It is shown that the killing occurred on an occasion when Dr. Sharp and his wife went to Mrs. Bird's home to return a pistol which belonged to her and which had been in his possession since Friday before the killing on Tuesday.

The facts and circumstances of the killing, as viewed from the state's standpoint, are shown by the testimony of Dr. Sharp's widow, who was a witness to the shooting.

Mrs. Sharp testified that while she and her husband were at home on the night in question, appellant called on the telephone and when she answered, he stated: "Mrs. Sharp, this is Burnett. If you and the doctor don't bring that gun over here, I am going to go over there and kill a couple of sons of bitches"; that after appellant had called five times, she and her husband decided to take the gun back and did go to Mrs. Bird's home; that when they arrived the doctor remained in the car while she went to the door; that upon being met by the appellant she handed him the gun which was unloaded at that time; that after she went in the house the doctor came in at appellant's invitation. She and the doctor then went into the kitchen where Mrs. Bird was seated at a table, and appellant then came into the kitchen and sat down at the table.

Mrs. Sharp further testified that while she and her husband were standing in the kitchen near the sink, the appellant was seated at the table, cursing and waiving a gun in his hand; that on two occasions he got up and left the room; that during the conversation appellant said, "I am not going to have any sons of bitches messing around Nona Bird, man or woman," and threatened to kill Dr. Sharp. Whereupon she showed appellant

the handle of a gun which she had in her pocket and said to him, "If you kill him, I will shoot you." Appellant then got up from the table and stood in the doorway with the gun, and at such time Dr. Sharp said, "What is wrong? Maybe if something is wrong, maybe I can help you, and let's sit down and talk about it." Thereupon appellant said, "You son of a bitch, I don't need any help," and then shot one time, after which the doctor fell to the floor with a bullet wound in his chest from which he died immediately; and that after the doctor fell, the appellant turned and ran.

Appellant, as a witness in his own behalf, related his associations with and plans for marriage to Mrs. Bird and testified that he had become suspicious of Dr. Sharp as to his visits to Mrs. Bird's home and his relations and attentions to her. He testified that some 30 days before the killing, he had seen the doctor and Mrs. Bird in a car kissing each other; and that on Friday night before the killing on Tuesday, when he returned to Mrs. Bird's home about midnight, he saw the doctor and Mrs. Bird in a compromising position and preparing to go to bed; that when he went inside the doctor had Mrs. Bird's gun pointed towards him, and that on such occasion the doctor left with the gun after emptying the shells. He testified that he called the Sharp's residence twice on Saturday and asked that the doctor return the gun, and again on Sunday talked to the doctor and Mrs. Sharp about returning the gun, but denied having made a telephone call to the Sharp residence on the day of the killing.

Appellant testified that on the night of the killing he left the house to get some whiskey, and when he returned around 10:30 o'clock Mrs. Bird told him that the Sharps had called and were bringing the gun home; that when they arrived Mrs. Sharp came into the house, slapped the gun down on the kitchen table and said, "Here is this damn gun, and I don't want to hear another damn word about it." She opened her purse and showed appellant another gun that was loaded and said, "That other gun is not the only gun I brought," and then put the gun in her slacks pocket; that he then secured three shells from a dresser drawer and put them into the gun which the Sharps had returned. Appellant testified that he and Mrs. Sharp then got into an argument about Dr. Sharp being there on Friday night and going to bed with Mrs. Bird, and when Mrs. Sharp called him a liar, he called Dr. Sharp in the house to prove his accusations; that when Dr. Sharp came in he appeared to be angry and threatened to beat him, and thereupon the discussion waxed and got heated. Appellant then got up and moved to the door with

the pistol in his pocket, and Mrs. Sharp stated to the appellant that if he accused the doctor again she was going to shoot him. The doctor then started towards the appellant and Mrs. Sharp turned around and started "over that way." Whereupon appellant pulled the trigger and shot the gun one time. Appellant testified that he did not intend to kill anyone and ran away because he was afraid.

The record presents five formal bills of exception which will be discussed in the order in which they appear in appellant's brief.

By Bill of Exception No. 2 appellant complains of the action of the court in permitting Dr. Sharp's widow to testify, over objection, that after the doctor was shot and lying on the floor, apparently dead, she said, "Daddy, please don't leave me, hang on." Appellant objected on the ground that such statement was made after the appellant had fled and was therefore hearsay and an appeal to sympathy. The court permitted the statement in evidence as res gestae, and in his qualification to the bill certifies that the utterance of the witness was made immediately after appellant had shot the deceased and while the deceased was dying and falling from the impact of the fatal shot or immediately thereafter, and that it was all in a matter of seconds.

We overrule appellant's contention that the statement, if inadmissible, was of such a prejudicial nature as to show injury to appellant requiring a reversal of the case.

By Bill of Exception No. 3 appellant insists that he was denied the right to fully cross-examine the state's witness, Mrs. Jack W. Sharp. The bill reflects that appellant attempted to cross-examine the witness as to her former marriage to a man by the name of Raymond Shelton, a divorce between them and the custody of their two children, her acquaintance with Dr. Sharp at such time, a divorce between Dr. Sharp and his former wife, and the subsequent marriage of the witness and Dr. Sharp. The witness testified, in the absence of the jury, as to her former marriage to Raymond Shelton which resulted in a divorce in 1949, and that Dr. Sharp received a divorce from his former wife thereafter in the same year. The witness denied that at the time she was divorced from her former husband she and Dr. Sharp were planning to be married, and denied that she had told her husband that she wanted to marry Dr. Sharp.

The bill, as qualified, shows that the court refused to permit

such matters on cross-examination to go before the jury on the ground that such testimony was inadmissible for the purpose of impeachment of the witness and was irrelevant, but ruled that appellant could identify the witness by a previous marriage and previous name and go no further into the matter.

It is appellant's contention that the action of the court denied him the right to fully cross-examine the witness and be confronted by the witness as guaranteed by Article 1, Section 10 of the Constitution of Texas, and the 6th Amendment to the Constitution of the United States.

The testimony sought to be elicited by appellant was not admissible for impeachment. Such testimony would only have shown that the witness had been married and divorced before marrying Dr. Sharp after he had been divorced.

In Earle v. State, 64 Texas Cr. R. 537, 142 S.W. 1181, it was held that proof that a husband had obtained a divorce from a witness on the ground of adultery was inadmissible to impeach her. Appellant's contention that he was denied the right to fully cross-examine the witness is overruled.

By Bill of Exception No. 1 appellant insists that the trial court erred in permitting the state's witness, Mrs. Jack W. Sharp, to testify as to a telephone conversation which she had with appellant shortly before the killing.

Appellant contends that this testimony was inadmissible because Mrs. Sharp was unable to identify the appellant as the one who made the call.

The court, in his qualification to the bill, certifies that it was proved by appellant's confession that he had a "telephonic" conversation with the witness at the time of the conversation she testified about, but that their versions of the content thereof varied.

We conclude that appellant's confession was sufficient to identify him as the one who talked to Mrs. Sharp in the telephone conversation, and the evidence of the telephone conversation was admissible.

In Hart v. State, 87 Texas Cr. R. 55, 219 S.W. 821, where an accused stated in his confession that he called certain officers and also so testified on the witness stand, it was held that he

6

was sufficiently identified as the party who did the talking and that testimony of the telephone conversation was properly admitted.

We perceive no error in Bill of Exception No. 4, which bill, as qualified, certifies appellant's objection to the action of the assistant district attorney in pointing his finger at appellant while making his closing argument to the jury. In Dinklage v. State, 150 Texas Cr. R. 12, 198 S.W. 2d 578, it was held that the action of a district attorney, during the course of argument, of pointing his finger towards the defendant while facing him and talking in a loud voice did not constitute reversible error.

By Bill of Exception No. 5 appellant complains of the court's refusal to declare a mistrial because of certain argument made by state's counsel to the jury.

The bill, as qualified, certifies that the assistant district attorney made the statement "that the defendant had filed an application for a suspended sentence in this case, but had not brought a single witness to show the jury what kind of a man he was"; that the court sustained appellant's objection to the argument and instructed the jury not to consider it and thereafter refused to grant a mistrial.

The argument complained of in this bill was not improper. Appellant having filed an application for suspension of sentence, placed his reputation in issue, which authorized state's counsel to comment upon the failure of appellant to call witnesses to attest to his good reputation. Taylor v. State, 157 Texas Cr. R. 124, 247 S.W. 2d 127.

Finding the evidence sufficient to support the conviction, and no reversible error appearing in the record, the judgment is affirmed.

Opinion approved by the Court.