James Edwin EARNHART, Appellant,

v.

The STATE of Texas, Appellee.

No. 57183.

Court of Criminal Appeals of Texas, Panel No. 2.

Jan. 10, 1979.

Joe M. Joiner, Sherman, for appellant.

Before ODOM, PHILLIPS and DALLY, JJ.

## OPINION

PHILLIPS, Judge.

This is an appeal from a conviction for murder. The punishment was assessed at 20 years' imprisonment.

Appellant was jointly tried with his brother, John Ray Earnhart, for the offense of murder before a jury. In his first ground of error appellant vigorously attacks the sufficiency of the evidence to sustain this verdict. A careful review of the evidence in a light most favorable to the fact finder's verdict reflects the following.

Deputy Sheriff Curtis testified that on November 30, 1974, he received a phone call from the Whitesboro Police Department and after taking certain actions that were subsequently explained by him when recalled, he dispatched officers to the Earnhart residence. When recalled, Deputy Curtis testified that he called the Earnhart residence phone number as listed in the local directory and a person who identified himself as John Ray Earnhart answered the phone and responded to the deputy's question by stating that a man had been killed in his home.

Deputy Sheriff Adams testified that he arrived at the Earnharts' residence at approximately 9:30 p. m. to investigate a shooting complaint and that John Ray Earnhart began "telling us before we could ask him questions" that some man had driven up bleeding, ran into the house, lay down on his bed and died. Deputy Adams testified that he looked into the victim's pickup truck and did not notice any blood. John Ray Earnhart then invited them into the house. Deputy Adams testified that the Earnhart brothers became suspects when they found no blood in the truck and all the blood in the house. After being placed under arrest, John Ray Earnhart went into his back bedroom to obtain a clean shirt and upon picking one up, he stated he did not want to wear it because there was blood on it. Deputy Adams then seized the shirt and preserved it as evidence. The brothers were then placed into the deputies' patrol car and

were then warned of their *Miranda* rights. The deputy testified that they returned the next ·day to search the house after obtaining a search warrant when an autopsy disclosed that the victim had been shot to death. The appellant was first seen in the southeast bedroom lying on a couch completely covered over. The victim was apparently found also in the bed in the southeast bedroom. John Ray Earnhart apparently had a cut and bloody thumb, but there were no apparent signs of cuts or blood on the appellant. The appellant and his brother both appeared to be drunk. John Earnhart claimed ownership of the shirt seized and which contained blood.

Deputy Sheriff Teague corroborated in large part the testimony of Deputy Adams. However, he testified that the appellant and his brother became suspects when he was informed that no one else had been in the home. Deputy Teague testified that he did not interrogate the appellant. He did state however that John Ray Earnhart was "drunk crazy, wild," but that the appellant was cooperative. He testified that during their earlier patrol round he noticed that Mr. Elkins' pickup truck was at the house around 4 p. m. as were two other pickup trucks which he knew the Earnharts to have driven on occasion. Although John Ray Earnhart said that the victim claimed he was shot while in his pickup, there was no apparent outside damage to the pickup truck. The motors on all the vehicles in front of the house were checked and found to be cold. The deputy further testified that he had information that the victim was at the house on the previous day. John Ray Earnhart claimed he had never seen the victim before, while the appellant said he knew him and gave the officer his name.

Mr. Richards, a mortician who was also the justice of the peace on the date of the offense, testified that he arrived shortly before the police and formed the opinion that the victim had been dead between four and five hours. He could not, however, determine the cause of death.

A Mr. Austin testified that on the night previous to this offense, November 29, 1974,

he arrived at the Earnharts' residence at approximately 8:30 p. m. and stayed for about one and a half hours. He testified that John Ray Earnhart began playing with a chain saw in the house and cut his thumb rather badly.

Chief Deputy Sheriff Bowling testified that he went to the Earnharts' residence on December 1, 1974, at approximately 2 p. m. to execute a search warrant. They found and seized a .22 rifle, three fired lead .22 caliber bullets, and a number of cartridge casings. He further testified that his investigation revealed a large puddle of blood under a chair and a trail of blood splatters from that chair through several rooms to a bathroom and returning from the bathroom to the bedroom and bed where the victim was found. A blood sample was taken from the chair and preserved for evidence. Blood was observed on the .22 caliber rifle seized. The house was unsecured when the police officers arrived to execute the search warrant. He testified further on cross-examination that there appeared to be some effort to wipe some of the blood up.

Texas Ranger Gant testified that he accompanied Chief Deputy Bowling during the search on December 1 and that blood samples were taken from the appellant and his brother.

Allen Jones, a firearms examiner with the Dallas County Criminal Investigation Laboratory, testified that the three .22 caliber lead bullets seized at the Earnharts' residence could not be matched with the .22 caliber rifle seized because one "lacked sufficient detail or striations to allow conclusive match" and the other two were "too mutilated." Two .22 caliber cartridge hulls were found to have been fired from the .22 caliber rifle seized "to the exclusion of all other weapons." The .22 caliber rifle seized was found to be in firing condition. The bullet fragments taken from the victim's brain were too mutilated for comparison.

Deputy Sheriff Clark who booked the appellant and his brother into jail on the evening of November 30, 1974, testified that the left thumb of John Ray Earnhart was cut and bleeding.

Dr. DeMayo, Associate Medical Examiner for Dallas County, testified that he conducted an autopsy on the victim and found a bullet hole in the right frontal region of the scalp surrounded by a flask-shaped wound with powder particles in the surrounding soft tissue. He testified that the bullet fragmented on impact with the skull bone and travelled back and down in a left to right direction. Two lacerations and two abrasions were found on other parts of the victim's body, but only the gunshot wound could cause the death in the opinion of the examiner. He testified that the muzzle of the gun was in contact with the skull upon discharge since there was no tattooing from the powder particles. He testified that the wound would not kill instantly but should have paralyzed the victim on the left side. He testified that it was highly improbable that he could move and walk about. Blood samples were also taken from the victim during the autopsy. The examiner further testified that the blood alcohol content of the victim's blood was .289, and .30 would induce alcoholic unconsciousness. This level of alcohol was testified to be equivalent to drinking 12 to 13 ounces of whiskey in one hour. There was also .39 milligrams of phenobarbital in the victim's blood.

Sarah Williams, an employee of the Dallas County Criminal Investigation Laboratory who specializes in blood and body fluids, testified that the blood sample taken from the .22 rifle seized at the Earnhart residence reflected a combination of all three blood samples, i. e., the blood samples of the appellant, John Ray Earnhart, and the victim. She testified that the samples of the appellant's and his brother's blood were of the same group, Group A, and had the same subsequent differentiations. The blood found on the green shirt seized at the time of John Ray Earnhart's arrest was compatible with the victim's blood sample. The sample of blood obtained from the chair under which a large puddle of blood was found was also consistent with the victim's blood grouping. Blood found on a beer can found at the scene was also consistent with all three blood samples received

by the witness, i. e., the appellant, John Ray Earnhart, and the victim. The witness finally testified that the blood of the appellant and his brother, John Ray Earnhart, was "exactly the same" as far as they could be typed by the witness. The blood grouping of the appellant and his brother was different, however, from that of the victim.

The defense presented no evidence.

Reviewing this evidence in a light most favorable to the verdict, we must conclude that it only shows that the appellant was present at the scene of the offense when the police officers arrived. There is no evidence of when the appellant arrived at the residence. None of the vehicles observed in front of the house earlier in the afternoon on the day of the offense were shown to have been owned by the appellant. Further, the officer who observed these vehicles testified that he did not ascertain whether anyone was present at the house at that time. The testimony clearly reflects that it was the appellant's brother, John Ray Earnhart, who had a bleeding wound. The appellant's blood type and that of his brother were exactly the same and that blood type was found on the purported murder weapon and the beer can, both of which also had blood similar to that of the victim's. The evidence before us in no way reflects that the appellant either shot the victim or in any other way solicited, encouraged, directed, aided, or attempted to aid his brother in the commission of the offense with the intent to promote or assist the commission of that offense. See V.T.C.A., Penal Code, Section 7.02(a)(2). Further, there is no evidence of a conspiracy to commit any felony or any evidence to establish the appellant's complicity in the offense charged.

▪ 24 Tex.Jur.2d, Evidence, Section 742 provides in pertinent part:

"In ascertaining whether the guilt of the accused has been established to a moral certainty, the appellate court will review the evidence in light of the presumption that the accused is innocent. The court will not presume any acts against the accused that are not shown to have been committed by him. Furthermore, a conviction will not be sustained on appeal if the evidence does not sufficiently establish all material elements of the offense charged. [Footnotes omitted.]"

This rule has been alternatively stated as follows:

"A conviction on circumstantial evidence cannot be sustained if the circumstances proven do not exclude every other reasonable hypothesis except that of the guilt of the accused; and proof amounting only to a strong suspicion or mere probability is insufficient."

*Davis v. State,* Tex.Cr.App., 516 S.W.2d 157; *Suff v. State,* Tex.Cr.App., 531 S.W.2d 814; *Brock v. State,* 162 Tex.Cr.R. 339, 285 S.W.2d 745; *Stogsdill v. State,* Tex.Cr.App., 552 S.W.2d 481. Every circumstantial evidence case must necessarily be tested by its own facts to determine the sufficiency of the evidence to support the conviction. *Stogsdill v. State,* supra; *Baker v. State,* Tex.Cr.App., 447 S.W.2d 172; *Moore v. State,* Tex.Cr.App., 532 S.W.2d 333; *Higgins v. State,* Tex.Cr.App., 515 S.W.2d 268; *Indo v. State,* Tex.Cr.App., 502 S.W.2d 166. As stated in *Suff v. State,* supra, at 817:

"... As to those situations in which one may be guilty as a principal when actually present, the very least that is required is, in addition to physical presence, encouragement by words or agreement to the commission of the offense. Such agreement must be prior to or contemporaneous with the criminal event."

The Court in *Suff* also noted the quotation from *Robinson v. State,* 493 S.W.2d 780, 782, where this Court stated:

"To be guilty of a felony offense as a principal, a defendant must be actually present at the time of its commission or if not present at the time of the commission of the offense he must at the time the act is being done, be himself actively engaged in the furtherance of the common purpose and design at some other place."

▪ The evidence here does not even show that the appellant was present at the

time of the commission of the offense, let alone providing encouragement by words or deeds.

To convict the appellant under the facts presented in this case required the jury to engage in rank speculation that he either committed the offense or was present and providing encouragement to his brother in the commission of the offense.

The judgment of conviction is reversed and reformed to reflect an acquittal under the authority of *Burks v. U.S.*, 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978), and *Greene v. Massey*, 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978). This cause is remanded for proceedings pursuant to Article 37.-12, V.A.C.C.P.

DALLY, J., concurs in the results.