John Ray **EARNHART**, Appellant,

v.

The **STATE** of Texas, Appellee.

No. 57245.

Court of Criminal Appeals of Texas, Panel No. 3.

June 20, 1979.

Joe M. Joiner, Sherman, for appellant.

Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

## OPINION

DALLY, Judge.

This is an appeal from a conviction for murder. The punishment was assessed at imprisonment for twenty years.

Appellant challenges the sufficiency of the evidence to support the conviction; complains of the admission in evidence of statements made by the appellant; complains of the prosecutor's argument to the jury; and contends that the trial court erroneously communicated an additional instruction to the jurors after their deliberation began.

Appellant and his brother, James Edwin Earnhart, were convicted of murdering Spurgeon Elkins at appellant's home in Grayson County, on November 30, 1974. The two men were tried together, but filed separate appeals; the conviction of James Edwin Earnhart was recently reversed in *Earnhart v. State*, Tex.Cr.App., 575 S.W.2d 551 (1979). A detailed statement of the facts of the offense is included in that opinion, and the reader is referred to that account as a supplement to the facts set out here.

At 9:00 p. m. on November 30, 1974, Grayson County Deputy Sheriff Hal Curtis received a telephone call from the Whitesboro Police Department concerning a call they had received. As a result of the conversation Curtis called the Earnhart residence, and asked who was speaking; the speaker responded, "John Earnhart." Curtis then asked the speaker if he had a problem at the residence, and the speaker answered, "Hell, yes, I do. There has been a man killed in my house."

At 9:30 p. m. Grayson County Deputy Sheriffs Don Teague and Troy Adams arrived at the Earnhart residence simultaneously with police officers from Whitesboro and Collinsville, two highway patrol officers, and ambulance personnel. A Justice of the Peace, M. H. Richards, had arrived shortly before. Adams testified, and was corroborated by Teague, that when they arrived appellant came out of the house to meet them and said:

"Come in here. The son of a bitch drove in here in that pickup there with that camper on it, bleeding like a stuck hog, and he's laid down in my bed and died."

Appellant stated that he did not know the deceased; appellant's brother told the officers that he knew the deceased.

Adams checked the deceased's pickup for evidence of blood, but found none. Teague checked the engine; it was cold. Appellant told Teague that the deceased had driven in two hours previously, which would have been 7:30 p. m. Teague testified that he had driven by the house earlier that day at 4:00 p. m. and had seen the deceased's pickup parked out front. Richards, who was a mortician as well as a Justice of the Peace, testified that when he saw the deceased at 9:00 p. m., the deceased had been dead for four to five hours.

Teague testified that the Earnhart brothers became suspects when they told him that no one else had been at the house. Teague also testified that on other occasions he had seen both brothers at the house, but he believed appellant actually lived at the house. Appellant referred to the house as "my house."

When the officers entered the house they found the deceased lying on a bed in the living room. There was blood on the bed, a large puddle of blood under an easy chair in the living room, and blood in various other parts of the room and in other rooms in the house. Teague testified that one of the deceased's eyes was blue and swollen, and there was a hole in the top of his head. According to Adams the house was in "quite a turmoil," and there were beer cans and a gin bottle littering the floor. Both brothers appeared to be drunk; Teague testified that appellant was "drunk crazy, wild," whereas his brother Jim was cooperative.

Both brothers were arrested and taken to jail. Before leaving, appellant, who was wearing only an undershirt, went to a back

bedroom to get a shirt. According to Adams appellant picked up a green shirt as if to put it on, then said, "It's got blood on it. I want to get a clean one." When Adams asked appellant if that was his shirt, appellant replied that it was.

The next day officers thoroughly investigated the scene of the crime. They found a .22 rifle stained with blood in a bedroom, six spent .22 cartridges in the living room, and three lead bullets. One of the bullets was lying on the floor of the living room, and the other two were imbedded in a wall, apparently after having been fired through one of the living room doors.

Allen Jones, a Dallas County firearms examiner, testified that two of the bullets were too mutilated to determine whether they had been fired from the rifle found in the house. The other bullet had "major and minor class characteristics" in common with the rifle, but it lacked sufficiently detailed striations to conclusively determine that it had been fired from the weapon. The gun was in operating condition. Jones testified that two of the cartridges had been discharged by the weapon, but he could not tell whether the other four cartridges had.

Sarah Williams, an employee of the Dallas County Criminal Investigation Laboratory, testified that she compared blood samples taken from the Earnhart brothers, the deceased, and the scene of the offense. According to Williams the brothers' blood samples were identical in type, and the deceased's blood type was different from the brothers. Both types were found in the blood sample taken from the barrel of the rifle. Appellant had cut his left thumb badly while shutting off a chain saw the day before the offense occurred; according to Teague the thumb was still bleeding and appellant was holding it when he and Adams arrived at the scene. Appellant's brother had hurt his ribs, but was not bleeding. A blood sample taken from the puddle of blood beneath the easy chair matched the deceased's blood type, as did a blood sample from the green shirt which appellant tried to pick up.

Dr. Vincent DeMayo, a Dallas County medical examiner, testified that the deceased received a gunshot wound from a .22 caliber weapon in the right frontal region of his scalp, and the wound was the cause of the deceased's death. A .22 caliber bullet, too mutilated to be of use for comparison purposes, was removed from the deceased's head. DeMayo stated that the muzzle of the weapon was in contact with the deceased's head when it was discharged, and that the weapon was held at "a shallow angle, pointing downward and backwards." According to DeMayo the wound would have caused the deceased to be paralyzed on the left side, and it was "highly improbable" that he could have moved after being wounded. The deceased's left knee was scraped, and DeMayo testified that the scrape could have been caused by dragging the knee across a hard surface. The alcohol content in the deceased's blood was .289, which DeMayo stated approached the point of alcoholic unconsciousness.

Blood was found, in addition to the living room, in the hall and the bathroom. Grayson County Chief Deputy Sheriff Shelby Bowling testified on the basis of the splashes or "fingers" formed by the blood as it hit the floor, that the trail of blood began in the easy chair, led from there out of the living room, down the hall to the bathroom, and back to the bed in the living room where the deceased was found.

■ Appellant contends that the evidence adduced does not support the conviction. Summarizing, the deceased died in appellant's house from a gunshot wound caused by a .22 caliber weapon. A .22 caliber rifle found in the house was shown to have been discharged at least twice at the appellant's house. Appellant made a suspicious exculpatory statement immediately upon the arrival of peace officers. The evidence showed that the statement was false, and the statement was inconsistent with a statement previously made by appellant to another officer over the telephone. The latter statement acknowledged that someone had been killed in appellant's house. Appellant evidenced ownership of a

shirt which was stained with blood of the same type as the victim's blood. No one besides the Earnhart brothers and the deceased were at the house at the time of the offense. This evidence weighs more strongly against appellant than it does against his brother. See *Earnhart v. State,* supra. We find that the evidence, viewed in a light most favorable to the State, is sufficient to support the jury's finding of guilt. Compare *Easley v. State,* 564 S.W.2d 742 (Tex. Cr.App.1978); *Indo v. State,* 502 S.W.2d 166 (Tex.Cr.App.1973); *Baker v. State,* 447 S.W.2d 172 (Tex.Cr.App.1969).

■ Appellant contends that it was error to admit statements made by appellant and his brother after they had been arrested and before they had been informed of their constitutional rights. Specifically, appellant complains of Adams' testimony that when appellant picked up the green shirt he said, "That's got blood on it, I don't want to wear that . . . I'd like to get a clean shirt," and the appellant's affirmative response when Adams asked him if it was his shirt. Appellant objected to this testimony; the trial court sustained his objection, and instructed the jury to disregard the testimony. Appellant did not request a mistrial. A hearing outside the presence of the jury was held, and it was established that at the time of the statement appellant had not been advised of his rights in accordance with *Miranda v. Arizona,* 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).

Subsequently, Adams testified before the jury as follows:

"Q. And after he was placed under arrest, what did you then do?

"A. I accompanied him into the back room, or the southwest bedroom of the house. He wanted to get a shirt.

"Q. What did you observe him do?

"A. He picked up a shirt from a box in the southeast bedroom.

"Q. What did he do with this shirt?

"A. He picked the shirt up to put it on. Then, he said, 'It's got blood on it. I want to get a clean one.'

"MR. JOINER: I still object to that statement.

"THE COURT: All right. We will overrule the objection."

It was later elicited, without objection, that when Adams asked appellant whether the shirt was his, appellant replied, "Yes, it was his."

Appellant's statement to the effect that the shirt had blood on it, and he wanted another one, was a voluntary statement, not in response to any inquiry by Adams, and not the product of interrogation. Such voluntary statements are admissible. See Art. 38.22(5), V.A.C.C.P.; *Larocca v. State,* 479 S.W.2d 669 (Tex.Cr.App.1972); *Walker v. State,* 470 S.W.2d 669 (Tex.Cr.App.1971). Adams' testimony that appellant picked up the shirt to put it on, and then put on a clean shirt, was also admissible. This evidence clearly showed that the green shirt was appellant's. The admission of appellant's response to Adams' question was harmless error beyond a reasonable doubt. See *Wood v. State,* 573 S.W.2d 207 (Tex.Cr. App.1978); *Hunnicutt v. State,* 531 S.W.2d 618 (Tex.Cr.App.1976); *Bridger v. State,* 503 S.W.2d 801 (Tex.Cr.App.1974). Moreover, appellant waived the error. His objection to Adams' original testimony was sustained, and he did not request a mistrial; Adams' subsequent testimony as to appellant's response was elicited without objection.

Appellant does not point to the admission of any other statements made by appellant or his brother, in violation of Art. 38.22, supra, and we find none in the record. This ground of error is overruled.

■ Appellant complains of the admission in evidence of the telephone conversation between appellant and Deputy Sheriff Curtis. Appellant objected to the admission of the conversation at trial on the grounds that Curtis could not identify appellant as the speaker, except by the speaker's reference to himself as "John Earnhart." In admitting the contents of a telephone conversation, the identity of the speaker is sufficiently established if the message reveals that the speaker has knowledge of

facts that only the speaker would be likely to know. *Gleason v. Davis,* 155 Tex. 467, 289 S.W.2d 228 (1956). Here appellant told Curtis facts concerning the death of the deceased that only he or his brother would know. Also, identity is established if a call is made to a business office over a line maintained by it for business purposes and the speaker represents that he is the one called, and there is no proof to the contrary. See *Gleason v. Davis,* supra; *Spolane v. Coy,* 153 S.W.2d 672 (Tex.Civ.App.1941). Curtis testified that he called the number listed as Earnhart Septic Tank, on Highway 377, north of Pottsboro. See also *Woods v. State,* 478 S.W.2d 541 (Tex.Cr.App.1972); *Churchill v. State,* 167 Tex.Cr.R. 26, 317 S.W.2d 541 (Tex.Cr.App.1958); *Burnett v. State,* 162 Tex.Cr.R. 1, 280 S.W.2d 260 (Tex. Cr.App.1955).

The statement made by appellant to Curtis was hearsay, but was admissible as an admission. Moreover, there was no objection at trial that the conversation was hearsay. No error is shown.

During jury argument the prosecutor made the following comment:

"Ladies and gentlemen, I told you on the first day you came into this courtroom that I was only required to prove that these defendants killed Spurgeon Ledale Elkins by shooting him with a gun. I don't have to tell you why. If I knew why, I would tell you, but I wasn't there. There were only three people there. By John Ray Earnhart's own words, no one else was there but his brother Jim Earnhart and this dead man.

"MR. JOINER: We object to that. That is not a proper argument, not a proper statement. We object to his making a statement like that.

"THE COURT: All right. Ladies and gentlemen, I will overrule the objection with this instruction. The deductions which Counsel make are deductions from the evidence as they remember it. You, of course, will remember the evidence as it was presented. What they say is not evidence."

Appellant contends that the statement constituted a comment on his failure to testify. Appellant's objection was general, and appellant did not notify the trial court of the grounds for his objection. Appellant did not clarify the grounds for his objection after the trial court gave its instruction to the jury, or press for further relief. No error is preserved.

Appellant contends that the prosecutor went outside the record and made a comment on appellant's right to remain silent when he stated that ". . . aiding a person overtly is no different from one of them saying, 'I will tell the story and don't you say a word.'" Appellant objected at trial on the grounds that the statement was outside the record. The objection was sustained, and appellant did not request an instruction to disregard or a mistrial. Appellant's contention is overruled.

Appellant complains of another remark by the prosecutor immediately following the last remark. However, appellant did not object to the remark, and no error is preserved.

After the jury began deliberating they sent a note to the court asking whether it was possible to give each defendant a different sentence. The trial court responded with the following written statement:

"MEMBERS OF THE JURY:

"I have your communication reading as follows:

"'Is it possible to give each defendant a different sentence?'

"In answer thereto, you are instructed that you have been provided with separate charges as to each defendant. You will be governed by the law contained therein and return a separate verdict as to each defendant.

"You will retire to consider your verdict."

Appellant contends that the answer given constituted an additional charge to the jury, and the trial court failed to answer the question in the proper manner. The answer simply referred the jury to the charges they

already had before them. A referral to the original charge is not considered an additional instruction. *Allaben v. State,* 418 S.W.2d 517 (Tex.Cr.App.1967); *Pigg v. State,* 162 Tex.Cr.R. 521, 287 S.W.2d 673 (Tex.Cr.App.1956). The trial court submitted the written answer to the State and appellant for objections before sending it in to the jury. Appellant's counsel expressly waived the reading of the answer in open court. The requirements of Art. 36.27, V.A. C.C.P. regarding communications with the jury were satisfied. See *Hardeman v. State,* 552 S.W.2d 433 (Tex.Cr.App.1977); *Smith v. State,* 513 S.W.2d 823 (Tex.Cr.App. 1974). No error is shown.

The judgment is affirmed.

CLINTON, Judge, dissenting.

This circumstantial evidence case was tainted with its trait of weakness from the moment Deputy Sheriffs Don Teague and Troy Adams independently and for different reasons surmised that the Earnhart brothers were culpable.

Teague said that the Earnharts became suspects when "they told me that no one else had been there;" for his part, Adams said they became suspects when it appeared, from the lack of blood in his pickup truck and all the blood inside the house that Elkins had not been hurt before he got to the house. Acting on their respective suspicions the deputies observed the body of the deceased—neither realizing that the deceased had been shot—engaged the brothers in conversation and made a limited inspection of the immediate area of the room where the body was found. It was the careful search the following day, along with detailed examination, of the premises which produced the forensic evidence and related testimony of the searching officers and expert witnesses. The facts and circumstances thus derived are summarized in the opinion in this case supplemented by the detailed statement in the case of brother James Earnhart.

From the testimony it seems that all conversation leading up to the Earnhart brothers being told they were under arrest occurred in the same room where the body of the deceased was found and examined. Whenever it appeared that the officers were going to take the brothers to jail and before either one had been given a *Miranda* warning,[1] appellant expressed to Adams his desire to go to a back room and get a shirt; Adams accompanied him and as appellant picked up a shirt out of a "clothes box" Adams heard him say, "That's got blood on it, I don't want to wear that.[2]" Adams then asked, "Is that yours?" and appellant replied, "Yes" and, further saying he wanted a clean shirt, he obtained one.

Adams was responding to a question asking where else he had observed blood and when his response was given, appellant immediately objected "to all this testimony" stating, "The man was under arrest and has not received any warnings, and we would like the jury not to consider any of this testimony." The trial court sustained that objection, instructed the jury not to consider the last answer "relative to what Mr. Earnhart said" and upon request of appellant instructed Adams just to answer the questions. The State obtained a bench conference after which the trial court excused the jury and asked the State to develop the "time factor" further. After some testimony and dialogue, during which the prosecutor represented, erroneously, as it turned out, that Teague had previously properly warned appellant, the State insisted that statements of appellant were spontaneous, res gestae of the arrest and not an oral confession; whereupon the trial court adjourned court to "take a look at this" and thereafter announced he would overrule the objection but let appellant clearly develop that at the time in question appellant "never had been warned of his rights."

---

1. Adams admitted that he did not warn them but thought Teague may have; whereupon the prosecutor expressed a desire to call Teague to show a warning before appellant was moved from the "southeast" room; in his testimony Teague "couldn't say" that either was warned in the house but that he had given the warnings when he "already had them in the car."

2. According to expert opinion, blood on the shirt was compatible with blood of deceased.

In his second ground of error, appellant complains, *inter alia,* of admission of his statements in the back or southwest bedroom, pointing to legislative concern reflected by Articles 15.17 and 38.22, V.A.C.C.P. and citing *Lopez v. State,* 384 S.W.2d 345 (Tex.Cr.App.1964). Conceding the point, still one problem confronting appellant and this Court is that in his final question to Adams on recross examination as to his questioning *James* Earnhart, appellant got a reply to the effect that Adams did not ask *James* anything, followed by a non-responsive reiteration that Adams "did ask John Ray if that was his shirt;" whereupon—without objection—the State asked Adams what was appellant's reply to the last question and Adams quoted appellant as saying, "Yes, it was his." Under the circumstances of earlier objections and the hearing and ruling of the trial court outside presence of the jury, Art. 40.09, § 6(d)(3), V.A.C.C.P., obviates renewing an objection in presence of the jury, *Price v. State,* 460 S.W.2d 420 (Tex.Cr.App.1970).

Admitting the statement of ownership of the shirt was error of constitutional dimension, *Smith v. State,* 507 S.W.2d 779 (Tex.Cr.App.1974). But the question remains whether error in admitting the statement was harmless beyond a reasonable doubt within the latitude afforded a reviewing court by *Harrington v. California,* 395 U.S. 250, 89 S.Ct. 1726, 23 L.Ed.2d 284 (1969) and *Chapman v. California,* 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967) that is definitively analyzed in *Bridger v. State,* 503 S.W.2d 801, 804–805 (Tex.Cr.App.1974). Having thoroughly read the record and summarized its salient features elsewhere or by reference to the opinion in No. 57,138, I am persuaded that evidence of guilt of our appellant in this circumstantial case is only slightly above the level of insufficiency to convict his brother: his blood type on the rifle that was thought to be but, in view of expert testimony that all he could say about the fatal projectile was that it was .22 caliber, was not proved to be, the murder weapon; his seemingly but not necessarily inconsistent reports to peace officers as to arrival and cause of condition of deceased;

his occupancy of the house in which a trail of blood spots suggest movement of Elkins from a chair in the living room to the bathroom and back to a bed in the living room—these factors, along with evidence of blood of deceased on the soiled shirt, appear to be highlights of what the prosecutor told the jury "is a difficult case and I am sure that your decision will be difficult."

In these circumstances, I am not convinced that impact of evidence that appellant admitted ownership of the bloody shirt on the minds of the average jurors would be so slight as to be harmless beyond a reasonable doubt or that the verdict would have been the same had the tainted evidence not been admitted. To the contrary, there is more than a reasonable possibility that the evidence complained of contributed to the conviction; cf. *Myre v. State,* 545 S.W.2d 820, 827 (Tex.Cr.App.1977); *Cunningham v. State,* 500 S.W.2d 820, 824 (Tex.Cr.App.1973). See also *Gonzales v. State,* 581 S.W.2d 690 (Tex.Cr.App.1979). The majority would have it that because appellant picked up the green shirt and, upon observing its condition, cast it aside, his acts "clearly showed that the green shirt" was his. The majority perceives today what the deputy sheriff standing next to appellant that night plainly did not. Adams asking the question, "Is that yours?" belies the hindsight perception of the majority. I agree with Deputy Adams that, given the described condition of the house and its occupants that night, merely because appellant picked up a shirt out of a "clothes box" did not mean that it was his shirt. Just as Deputy Adams felt he had to ask the question in order to learn the fact of ownership, so we should deny him the fruits of the constitutionally impermissible inquiry.

For the violation of constitutional rights, I would reverse and remand.