In The



Court of Appeals



Ninth District of Texas at Beaumont



____________________



NO. 09-04-199 CR


____________________



BRIAN DESHOTEL, Appellant



V.



THE STATE OF TEXAS, Appellee






On Appeal from the 9th District Court


Montgomery County, Texas


Trial Cause No. 04-01-00259 CR






 MEMORANDUM OPINION 


 Appellant brings this appeal from his sexual assault conviction and raises three issues. 
He complains of the evidence's factual insufficiency, the prosecution's improper jury
argument, and the trial court's sentencing error. We affirm.

 The jury found Brian Deshotel guilty of sexual assault. See Tex. Pen. Code Ann. §
22.011 (Vernon 2003). In addition, he pled true to the indictment's enhancement paragraph
regarding his previous conviction for burglary of a habitation with intent to commit
aggravated assault. After hearing additional evidence on punishment, the trial court assessed
Deshotel's punishment and sentenced him to life imprisonment in the Texas Department of
Criminal Justice, Institutional Division.

 Around 1 a.m. on December 27, 1996, CDB reported to law enforcement officers that
she had been raped after her male assailant drove her to a wooded area nearby. Emergency
personnel came to the scene and took CDB to a hospital for examination and evidence
collection. While CDB was at the hospital, medical personnel collected a vaginal swab from
her. 

 In December 2003, Deshotel was identified as CDB's attacker after a laboratory
comparison of two DNA profiles. One profile came from Deshotel's blood sample drawn
in September 2003 pursuant to a search warrant. (1) The other profile came from sperm found
on CDB's vaginal swab collected on the night of the 1996 offense. The comparison showed
that the sperm collected from the vaginal specimen was Deshotel's.

 In presenting his insufficiency argument, Deshotel contends that he did not commit
sexual assault because CDB and he had consensual sex on the evening in question. The
offense of sexual assault occurs when a person "intentionally or knowingly causes the
penetration of the . . . female sexual organ of another person by any means, without that
person's consent." Tex. Pen. Code Ann. § 22.011 (a)(1)(A)(Vernon 2003). (2) As Deshotel
admits he had sex with CDB, the only element of the offense at issue is whether the sex
occurred without CDB's consent. Thus, we must determine the factual sufficiency of the
evidence showing that CDB did not consent to having sex with Deshotel. 

 In conducting a factual sufficiency review, we view all the evidence in a neutral light
and will set aside the verdict only if the evidence is so weak that the verdict is clearly wrong
and manifestly unjust, or the contrary evidence is so strong that the beyond-a-reasonable-doubt standard of proof could not have been met. Escamilla v. State, 143 S.W.3d 814, 817
(Tex. Crim. App. 2004)(citing Zuniga v. State, 144 S.W.3d 477, 481 (Tex. Crim. App.
2004)). We recognize that the jury may draw reasonable inferences from the evidence before
it. Jones v. State, 944 S.W.2d 642, 647-48 (Tex. Crim. App. 1996).

Evidence Supporting The Verdict
 

 At trial, CDB testified that on the evening of her rape, she first went to a pool hall and
then to a friend's house. As her 1 a.m. curfew time approached, she went to a payphone to
seek a ride home because her friend did not have a phone or vehicle. CDB further stated that,
while she was at the payphone, an unknown person (later identified as Deshotel) drove up
in a "brownish" Ford truck and asked where the hospital was. This person had his mouth
wired shut. (3)
 CDB testified that she left with Deshotel because she needed a ride home.
Deshotel drove by CDB's home, and did not stop. CDB testified that instead Deshotel put
a knife to her throat and drove to the woods.

 CDB further testified that Deshotel started smoking "something in a pipe," ripped her
shirt off, tied her hands behind her back with her shirt, and started raping her. CDB told
Deshotel to stop, but he "[j]ust kept going." She did not want to have sex with Deshotel but
could not get up or out of the truck because he was "laying on [her] legs." After a while,
Deshotel stopped and CDB put her clothes on and got out of the truck. She stated that she
"went and talked to people and told them what happened."

 The State presented several disinterested witnesses who saw CDB shortly after she
was raped. These witnesses were Robert Freund, Grady Perry, David Bell, Kent Simon, and
Dr. Jed Shay. They all talked with CDB, observed her appearance, and observed her
demeanor. 

 Robert Freund and Grady Perry, night-shift employees of a packing company close
to the wooded area where CDB was raped, were the first persons to see her after she walked
out of the woods. Freund was outside the company building at 1 a.m. taking a smoke break
when CDB approached and told him she had been raped. Freund testified that CDB's blouse
was ripped, exposing part of her brassiere, and that she appeared visibly shaken and upset. 
Perry testified that after he was called outside by Freund, he called 9-1-1. To Perry, CDB
looked "really troubled." Her shirt was "very badly torn," and she was not speaking. 
Instead, she was crying.

 David Bell, a corporal with the Montgomery County Sheriff's Department, and Kent
Simon, an emergency medical employee, responded to the 9-1-1 call. Bell testified that he
talked with CDB, who was wearing a torn tee shirt and was visibly shaken and upset. CDB
told Bell that she was raped by a white male whose mouth was wired shut because of a
broken jaw and that he drove her to a wooded area and sexually assaulted her. The wooded
area was close to the building where she approached Freund. She described her attacker's
vehicle as a dark colored pickup, possibly a Ford. (4) Simon testified that CDB appeared
shaken, nervous, upset, and had an irregularly high pulse rate. Simon took her to the hospital
by ambulance for an examination and evidence collection for rape. 

 After arriving at the hospital, CDB was seen in the emergency room by Dr. Jed Shay. 
He testified that his records reflected that CDB presented in distress and complained of being
sexually assaulted. Her pulse was 110, higher than normal, and she was crying and appeared
depressed. She reported to Dr. Shay that an unknown male took her into the woods where
he sexually assaulted her. Dr. Shay testified that a white smear was present in her vaginal
area; that there were red areas on her neck, upper left arm, and wrist; and that there was
redness on her chest along with a contusion on her right shoulder. Dr. Shay's clinical
impression was sexual assault. He testified that emergency room personnel collected
evidence from CDB and placed it in a sexual assault kit. 

Evidence Against The Verdict


 Deshotel acknowledges that the evidence preponderates in favor of his conviction, but
contends that the verdict is against the great weight of the evidence as to whether the parties
had a consensual relationship. According to Deshotel's trial testimony, he was acquainted
with CDB and had an intimate relationship with her during the summer of 1996 when he
lived in an apartment with James McNutt. (5) He testified that, on the night of her assault, CDB
contacted him and asked him for a ride home. Deshotel said he picked up CDB in his truck
and then they drove to an area located near warehouses. Deshotel stated that he and CDB
talked and kissed, and eventually had sex. Afterwards, they argued and Deshotel drove away
by himself, leaving CDB in the area where they had parked. Deshotel also testified that he
was unaware of CDB's rape claim until 2002.

 Deshotel attempted to bolster his prior relationship contention with testimony from
two witnesses - his father, James Deshotel, and his former roommate, James McNutt. James
McNutt testified that he shared an apartment with Deshotel in the summer of 1996 and that
he was present when Deshotel first met CDB. In the week that followed the meeting,
McNutt saw CDB at Deshotel's apartment. McNutt also stated that he had seen CDB driving
a Lincoln Town Car. However, on cross-examination, McNutt admitted he was in jail during
the summer of 1996 and that he could not remember when he shared an apartment with
Deshotel. Then, on redirect, McNutt maintained that in the summer of 1996, he had
absconded from a rehabilitation unit for two weeks and lived with Deshotel for that time
before he was returned to jail. On cross-examination, McNutt also admitted that he had a
criminal history and drug problems and further had failed to rehabilitate himself during
probation and parole. 

 In addition, other witnesses contradicted parts of McNutt's testimony. McNutt
testified that in the summer of 1996 when he and Deshotel met CDB, she was with a younger
brother who needed seizure medication. However, CDB's mother testified that CDB's
brother did not have seizures and did not need medication. McNutt also testified that on one
occasion he drove CDB's car to her parents' home on Highway 1960, past the Willowbrook
Mall. However, in 1996, CDB and her family lived in River Plantation located in
Montgomery County, according to her stepfather.

 James Deshotel, appellant's father, testified that he met CDB one week-end at his
home, but did not specifically give a date for the meeting. However, he was "very sure" that
CDB was the girl he met. He also testified that he "absolutely" did not want his son going
back to prison, but contended he would not lie to help his son. 

 CBD's testimony that she was raped is supported by the disinterested witnesses who
observed her appearance - she was wearing torn clothing - and observed her behavior - she
was shaken and upset; she was crying, nervous, troubled, and not speaking. Physically, she
had an abnormally high pulse rate, had several red areas on her body and a contusion on her
right shoulder. She also had sperm present in her vaginal area. 

 Deshotel, however, contends that the great weight of the evidence shows he and CDB
had a consensual relationship. He relies on his own testimony as well as that of his father,
James Deshotel and McNutt. As to McNutt, his credibility was severely impeached during
cross-examination and James Deshotel's testimony was vague on when he met CDB. The
jury could have dismissed James Deshotel's identification of CDB as the wishful thinking
of a father who did not want to see his son go to prison. Moreover, the jury was entitled to
reject entirely the testimony of these witnesses. See Williams v. State, 692 S.W.2d 671, 676
(Tex. Crim. App. 1984). It is the province of the jury to evaluate the credibility and
demeanor of witnesses and determine the weight afforded contradicting testimony. Cain v.
State, 958 S.W.2d 404, 408-09 (Tex. Crim. App. 1997).

 Deshotel also attacks CDB's credibility regarding her description of his truck's color
and of her attacker. While CDB described the truck as "dark" and "brownish," Deshotel
drove a green truck. Further, on cross-examination, CDB acknowledged telling the officers
that her assailant was 5 feet, 7 inches tall and weighed 140 pounds while Deshotel testified
at trial that he was 5 feet, 11 inches and weighed 240 pounds. Deshotel did not testify about
his weight at the time of CDB's attack.

 The jury may have considered that these discrepancies in CDB's testimony were
related to her attacker's identity rather than to the contested consent issue, and, thus, were
unimportant. Deshotel admitted having sex with CDB on the night she reported the assault
and the DNA test of the vaginal swab taken from CDB establishes that Deshotel was the
person with whom CDB had sex shortly before she reported the assault. As to Deshotel's
testimony that the sex with CDB that evening was consensual, it is contradicted by CDB's
testimony. 

 The jury determines what weight to give to contradictory testimonial evidence because
such evidence involves evaluating the witnesses' credibility and demeanor. See Saxer v.
State 115 S.W.3d 765, 773 (Tex. App.--Beaumont 2003, pet. ref'd). We do not substitute
our own judgment for that of the jury. Jones, 944 S.W.2d at 648. Instead, we give due
deference to the jury's decision to credit CDB's graphic testimony showing that she did not
consent to have sex with Deshotel that night. Cain, 958 S.W.2d at 407-09.

 We find that the evidence that CDB did not consent is strong enough to preclude a
"clearly wrong and manifestly unjust" verdict and we find that Deshotel's contrary evidence
on consent is not "so strong that the standard of proof beyond a reasonable doubt" was not
met. See Escamilla, 143 S.W.3d at 817. Accordingly, we overrule issue one.

 In issue two, Deshotel contends the trial court committed reversible error in overruling
his objection to improper jury argument. In the State's closing argument, the following
exchange occurred: 

 Prosecutor: And sure, there was no blood, there [were] no broken bones. It's
because she didn't resist. And we are indeed fortunate that she didn't resist,
because had she resisted his force, there's no telling what type of case we'd be
trying today.

 

 Defense Counsel: Objection to speculation.

 

 The Court: Excuse me?

 

 Defense Counsel: Improper jury argument.


 The Court: Overruled.


 The record reflects that counsel's objection to "speculation" was either not heard or
not understood by the trial court. In response to the trial court's query, "Excuse me?,"
counsel only said "Improper jury argument." Defense counsel said nothing to indicate why
the prosecutor's argument was improper. The trial court correctly overruled the objection
as it is only a general objection that presents nothing for review. See Huggins v. State, 795
S.W.2d 909, 912 (Tex. App.--Beaumont 1990, pet. ref'd)(citing Earnhart v. State, 582
S.W.2d 444 (Tex. Crim. App. 1979)). Issue two is overruled.

 In issue three, Deshotel says the trial court committed reversible error in sentencing
him, over his objection, without the preparation of a presentence investigation report that he
had requested. See Tex. Code Crim. Proc. Ann. art. 42.12, § 9(g) (Vernon Supp. 2005). 
 The following exchange between the trial court and counsel occurred:

 Defense counsel: Judge, we object to going forward without the PSI that was
ordered by the Court even though it was a short form. At this time, I would
like to see what that would be.

 

 The Court: PSI in the short form mainly is what your client would tell them. 
I don't see what harm it has versus not proceeding with the PSI.

 

 Defense counsel: All right, Judge.

 

 The Court: That is denied. All right. I need to find the indictment. 

 In Whitelaw v. State, 29 S.W.3d 129, 134 (Tex. Crim. App. 2000), the Texas Court
of Criminal Appeals held that the trial court must order preparation of a PSI report in a felony
case when the defendant requests one. However, the State contends that Deshotel agreed to
proceed without the report. The State asserts that Deshotel either invited the trial court to err
or failed to preserve error by not stating a specific objection. The State alternatively
contends that the trial court's error, if any, was harmless. 

 Here, it is not clear that appellant either invited error or agreed to move forward
without the PSI. Defense counsel's statement ("All right, Judge") may simply have been an
acknowledgment that the trial court had made its determination. Defense counsel did not
clearly request the trial court to undertake the action about which he now complains. 
Compare Prystash v. State, 3 S.W.3d 522, 532 (Tex. Crim. App. 1999)(holding invited error
existed when appellant complained of the trial court's deleting a jury charge as he requested). 
Further, trial counsel stated the grounds of his objection with sufficient specificity ("we
object to going forward without the PSI") and he obtained a ruling on his objection as
required by the Rules of Appellate Procedure. See Tex. R. App. P. 33.1(a). 

 Thus, while we find the trial court erred in proceeding without the PSI, we further
must determine if the error was harmful. See Whitelaw v. State, 29 S.W.3d at 132 (observing
that having a full punishment hearing may impact determination of whether error was
harmless).

 Nonconstitutional error is harmless if it did not affect the defendant's substantial
rights. Tex. R. App. P. 44.2(b). "A substantial right is affected when the error had a
substantial and injurious effect or influence in determining the jury's verdict." King v. State,
953 S.W.2d 266, 271 (Tex. Crim. App. 1997). But when the record as a whole shows that
the error either did not influence the verdict or only slightly affected it, we consider the error
harmless and allow the conviction to stand. Johnson v. State, 967 S.W.2d 410, 417 (Tex.
Crim. App. 1998).

 When determining if the error affected the punishment decision, we consider the entire
record, the nature of the decision's supporting evidence, the type of error involved, and the
error's relationship to other record evidence. See Morales v. State, 32 S.W.3d 862, 867
(Tex. Crim. App. 2000); Yarbrough v. State, 57 S.W.3d 611,619 (Tex. App.--Texarkana
2001, pet. ref'd)(applying Morales to PSI error). As the Yarbrough Court explained: 

 The purpose of a PSI report is to provide the trial court with information
regarding "the circumstances of the offense with which the defendant is
charged, the amount of restitution necessary to adequately compensate a victim
of the offense, the criminal and social history of the defendant, and any other
information relating to the defendant or the offense requested by the judge."
Tex. Code Crim. Proc. Ann. art. 42.12, § 9(a). The only conceivable harm
to [the defendant] that could result from the trial court's refusal to order a PSI
report would be [the] inability to call the judge's attention to favorable
information about [defendant's] character or social history that could
potentially contribute to a lenient sentence.


Yarbrough, 57 S.W.3d at 619.

 Deshotel had a full hearing on punishment. The trial court heard the testimony of
Deshotel's parole officer. Further, Deshotel's testimony from the guilt-innocence phase was
re-offered by the State at punishment. Also, the trial court heard potentially mitigating
evidence from Deshotel's father and mother. They attested to their son's non-violent
temperament, his attempts to improve himself by taking courses and receiving diplomas in
various vocational fields, his politeness and helpfulness at home, and his attempts to get help
for his drug abuse problem. Both parents asked the trial court for leniency. Further, the trial
court did not preclude the defense from offering additional witnesses at the punishment
hearing.

 The evidence offered by Deshotel's parents at the punishment hearing, however, must
be considered in the context of the evidence from the guilt-innocence phase, all of which was
re-offered by the State. We previously evaluated this evidence in issue one and need not re-evaluate it. But, we note that Deshotel himself, in the guilt-innocence phase, admitted he was
on parole at the time of CDB's assault and had used crack cocaine often. He further testified
that he had been convicted of credit card abuse, robbery, and burglary with intent to commit
aggravated assault and had been sentenced to a total of fourteen years in prison. Deshotel
also admitted that he had been in rehabilitation for drug abuse and that his parole was
revoked the year before his trial. 

 Deshotel was allowed to present evidence to persuade the trial court to be lenient. We
find he has not shown harm in not having the report available at sentencing. Issue three is
overruled.

 Accordingly, we affirm the jury's verdict and the trial court's judgment.

 AFFIRMED.

 ___________________________ 

 HOLLIS HORTON

 Justice


Submitted on June 28, 2005

Opinion Delivered August 31, 2005

Do Not Publish


Before Gaultney, Kreger and Horton, JJ.
1. Deshotel testified that while he was in prison in 1999, his blood sample was taken
for inclusion in the Texas DNA data base. After Deshotel's 1999 sample was matched to the
semen sample collected from CDB, another blood sample was taken from him. 
2. The language of section 22.011 (a)(1)(A) contained in the 1996 statute is identical
to that contained in Vernon's main 2003 volume. 
3. In early December, 1996, Deshotel underwent surgery on his lower jaw and his
mouth was wired shut. The wires were removed on January 17, 1997.

4. In 1996, Deshotel drove a 1994 green Ford truck. 
5. According to Deshotel's parole officer, however, Deshotel was living with his father
in 1996.