Don R. McKENZIE, Appellant,

v.

The STATE of Texas, Appellee.

No. 60032.

Court of Criminal Appeals of Texas, Panel No. 2.

May 20, 1981.

Rehearing Denied July 1, 1981.

Robert O. Smith, Austin, for appellant.

Ronald Earle, Dist. Atty. and Bill White, Asst. Dist. Atty., Austin, Robert Huttash, State's Atty., Austin, for the State.

Before DALLY, W. C. DAVIS and CLINTON, JJ.

## OPINION

CLINTON, Judge.

This is an appeal from a conviction for indecency with a child, denounced by V.T. C.A., Penal Code § 21.12(a)(1), [1] aided by the definition of "sexual conduct" in *id.*, § 21.01(2).[2] A jury found appellant guilty as charged and, rejecting his application for probation, assessed punishment at six years confinement.

An essential element of the offense of indecency with a child is the mental state that accompanies the forbidden conduct: the specific intent to arouse or gratify the sexual desire of any person. *Victory v. State*, 547 S.W.2d 1 (Tex.Cr.App.1976); *Clark v. State*, 558 S.W.2d 887, 891 (Tex.Cr. App.1977). In his first ground of error appellant contends there is "*no* evidence"[3] that such an intent joined his conduct at issue.[4] A recitation of the facts is in order, and because they are not seriously disputed we draw freely from the presentation by appellant, elaborating details when germane.

September 18, 1977, during the late morning hours of that Sunday, one six and two seven year old girls[5] were playing around a commercial area on Burnet Road in Austin. Open for business near the residence of one girl was a convenience store where they bought "an Icee and stuff." Though closed, neighboring buildings, one of which was called the Promenade Center, housed a "Gibson's," a "Cleaners" and offices; behind them two story duplex units under construction were attended by a security guard, one James Carter Wilhelm. Karen had on a shirt and pants, to be distinguished from a skirt, and under them she was wearing panties.

The girls were approached by a man in a car who told them he was looking for a lost dog and there was a reward of twenty five dollars for finding it; he asked them to help and Karen and Megan agreed, but Becky went to the house.

For some time, perhaps thirty minutes, usually on directions from the man, the two girls walked to and fro while the man drove around in his car, meeting them at various locations behind one building or another. The first time was behind the "Cleaners." At one point near the Promenade Center the man left his car and asked Karen to take off her tennis shoes and let him look at them, representing that he wanted his daughter to get some. The he directed them to go to the nearby unfinished construction site where he would drive to meet them. After they all arrived he pointed out an apartment for Megan to look into for the dog, while he and Karen went to another one. There he suggested climbing some stairs to the second floor; once there they were shortly accosted by Wilhelm who, hav-

---

1. The indictment substantially tracks that part of § 21.11 which provides:

    "(a) A person commits an offense if, with a child younger than 17 years and not his spouse, . . ., he:
    (1) engages in sexual contact with the child . . ."

2. "(2) 'Sexual contact' means any touching of . . . any part of the genitals of another person . . . with intent to arouse or gratify the sexual desire of any person."

3. All emphasis is supplied throughout by the writer of this opinion unless otherwise indicated.

4. Though appellant presented no evidence at guilt-innocence, testifying at the punishment he stoutly denied to the jury that he committed the offense, theorizing to the questioning prosecutor that he had been mistakenly identified as the perpetrator.

5. As is our wont the girls are referred to by a first name only: Karen, then six, is the prosecutrix; Megan was with her during most of the

ing heard the sound of their movements,[6] had come to investigate. The man, when asked his business, represented he was thinking about renting a duplex, and Wilhelm pointed out the rental office in another building and went back to his station, hearing the sounds of their departing promptly thereafter.[7]

Still purportedly looking for the dog, the man told Karen and Megan to go with him back behind the Cleaners. Once again, as she was sitting on a "bench" and Megan was standing nearby on "a long piece of wood," the man asked Karen to remove her tennis shoes, which she did. Kneeling down before her, the man remarked that he was "a child's doctor," was going "to see if she were clean," undid her pants, pulled them down to knee level and touched her "in front there,"[8] demonstrating to the jury with one of her favorite dolls that it was "[r]ight here (indicating)."[9]

The incident was over in a moment. The man told her and Megan to go, got in his car and parted saying, "I'll meet you tomorrow about 2:00 o'clock. . . ." Denying she

encounter; Becky left their company at the outset.

6. While on or near the stairs, at some point not too clearly stated by Karen, the man said to her, "I am going to lift you up into the basement [sic] and see if you can find my dog." He did so by holding her waist and lifting Karen up to look into whatever it was she called the basement—maybe she meant attic.

7. When first asked Karen did not remember whether the man mentioned to Wilhelm that they were looking for a lost dog, but she later recalled after Megan rejoined them the man said, "Let's go back to where the Security Guard was;" they did, and the man said he was looking for a dog, and Wilhelm responded that he had seen a doggie near the Promenade Center. They then went there again and the man tried to open the doors to the place.

8. First given by the prosecutor—surely because it is the statutory term—no word other than "touch" was used by him, Karen and Megan to describe the "sexual contact" in their testimony. Indeed, Megan said she saw the man touch Karen, yet cautioned "but don't ask me where, because I'm not sure." Unlike Karen, Megan said that at the time Karen "was laying down." However, the mother of Megan testified without objection that when Karen and Megan returned home and reported what had happened Karen said the man also said he wanted "to see if she were clean—if she cleaned herself," and then that "he touched her. He spread her vagina and looked." Similarly, the mother of Karen recalled Karen had recounted that "the man then unbuttoned her pants and pulled them down, and that he touched her," showing where he did; she further testified:

"... And that the man said that he was— wanted to look at her to see if she kept herself clean, and that he was a child doctor. And I asked her at that point if the man had hurt her with his hands or put his hands inside her, and she said no, he didn't hurt her, but that he did touch her down there.
Q: Okay. Where did she indicate on her body that he had touched her?
A: Well, between her legs.
Q: Her genitals?
A: Yes, uh-huh."

9. Given the statutory phrase and the indictment allegation "touching the genitals," the alert trial judge visualized just how inadequate would be the transcribed notation of the demonstration, for when the prosecutor was recapping with Karen her testimony on this point the following occurred:

"Q: So, Karen, you said that this man touched you and you pointed out on your doll *right here in front.* Right?
THE COURT: Show me.
Q: *Private parts.* Right? Is that right, Karen?
A: Yeah.
Q: Okay. Show the Judge.
THE COURT: Let the record reflect that she shows the *genital areas* of the doll that she's holding."

(Karen became "scared" as she was relating the sexual contact, but that she was traumatized by having to demonstrate the point of his touching on her doll is evident from the record. This then seven year old child, doubtless having been taught to avoid the very conduct, was being asked to demonstrate on a favorite doll that which she had been forbidden to do and what the man was being prosecuted for doing to her. Well aware of the difficulty in bringing out the required facts from a prosecutrix of tender years, still we cannot commend compelling her to perform such a demonstration. This is not to fault the trial judge for he did not initiate the procedure; rather, once it was underway without objection he clarified the matter and without the statement of his observation reflected in the record resolution of the issue would be much more troublesome.) The evidence is sufficient to support the allegation in the indictment of "touching the genitals." *Tyra v. State,* 534 S.W.2d 695, 697 (Tex.Cr. App.1976); *Ball v. State,* 163 Tex.Cr.R. 214, 289 S.W.2d 926, 928 (1956).

felt "scared" after he touched her, Karen said, "I felt silly at the first."

Appellant was identified by Karen and Wilhelm as the man. No other witness to the events could or did.[10] Appellant did not present any defensive testimony.

Now, in asserting "no evidence" of the requisite intent to arouse or gratify his sexual desire, which the jury was charged it must believe from the evidence beyond a reasonable doubt, appellant reports that exhaustive research has not discovered any prior decision under the old law [11]—there being none on sufficiency of evidence since enactment of the present penal code when the brief was filed in the trial court [12] —"where there was not some evidence of lascivious intent," [13] and argues that the proof here is devoid of that kind of evidence.[14] In its turn the State points to old Article 535c, indecent exposure to a child, and cases deciding sufficiency issues under

it which held "lascivious intent can be inferred from the defendant's conduct," [15] it reads *Ball v. State*, supra, differently than appellant, and argues that the "scenario in the instant case lends itself to a similar interpretation." [16] While the specific intent may be derived from inferences, the closeness of the factual issue before us must be conceded.[17]

The primary constant we note is that the man directed the girls to go to and meet him at some particular location; they always walked while he drove in his car— never were the girls invited to, nor did they, ride with him. From this, competing inferences occur, but when that circumstance is coupled with another common characteristic one begins to believe that the man was avoiding being seen with the girls in areas where the members of the public might be on that Sunday morning. Thus, every loca-

10. Four days after the Sunday morning episode, on Wednesday afternoon Karen selected a photograph of appellant from an array of six; Wilhelm had done the same earlier in the day. Testimony of all this was given pretrial, and the court specifically found prospective incourt identification to be of independent origin and not at all tainted by the photographic display.

11. Article 535d, 1925 Penal Code, provided in pertinent part that it was unlawful "for any person with lascivious intent to intentionally place . . . his . . . hand or hands . . . upon or against a sexual part of a . . . female . . . , or to in any way or manner fondle . . . a sexual part of a . . . female under the age of fourteen (14) years. . . ."

12. In *Clark v. State*, supra, though not challenged, the evidence was ample.

13. Appellant collects illustrative cases and digests the evidentiary lasciviousness of each in his brief, viz:
   ". . . *Davis* [sic—Jones] *vs. State* (1951) 156 Tex.Cr.R. 76, 238 S.W.2d 531 (Licked child's genitals and asked if it felt good); *Daywood vs. State* (1952) 157 Tex.Cr.R. 266, 248 S.W.2d 479 (internal injury such as could be caused by a fingernail); *Ball vs. State* (1956) 163 Tex.Cr.R. 214, 289 S.W.2d 926 (kissed childs privates and put discharging male organ between legs); *Alexander vs. State* (1966) 402 S.W.2d 170, Tex.Cr.App. ('This is the way to kiss,' while feeling breasts and genitals); *Reagan v. State* (1967) 423 S.W.2d 335, Tex.Cr.App. (Talked about having babies while feeling between child's legs)." [Original emphasis]

14. "No kissing, sex talk, fondling, penetration, no evidence the male was sexually aroused, no expressed admonishment not to tell mother or any other word, act or gesture that has any [probative] value in justifying a finding of fact of the intent necessary . . . "

15. *Bowles v. State*, 550 S.W.2d 84 (Tex.Cr.App. 1977) assembles may of them which support the proposition that the inference may be drawn "from the defendant's conduct, remarks and surrounding circumstances."

16. From selected highpoints in the evidence the State concludes that appellant's "conduct and remarks in soliciting Karen and her friend away from home and the act of touching Karen's genital was [sic] sufficient evidence of appellant's intent to arouse and gratify his sexual desire . . . "

17. From the statement of purpose attributed to the man by Karen and Megan, the appellant asserted to the jury, "But, it's not against the law for a person to examine, to look at or touch the genitals of another person to see if they're clean." The prosecuting attorney dismissed the argument as "silly," but now in its brief the State characterizes the res gestae statement as "part of the criminal act of indecency with a child;" that is, the words uttered by the man were designed to enable him to engage in the touching. See *Grady v. State*, 466 S.W.2d 770, 771 (Tex.Cr.App.1971).

tion to which he directed the girls was invariably behind a building [18]—except the duplexes then under construction,—where presence of other persons was unlikely.

The next point of significant conduct by the man is the whole scene at the construction site. First, he manages to separate the two girls, sending Megan to one unit by herself and taking Karen to another, and climbing stairs to a second story. Thus he farther isolated Karen and, for the first time ever, made physical contact with her: he placed his hands around her waist and lifted her up to look in the "basement," ostensibly for a lost dog. Though Wilhelm seems not to have seen this movement, he was informed immediately upon inquiry that the man was looking around with the thought of renting—nothing about a lost dog. Then, again according to Karen, as they were leaving with Megan, the trio went by Wilhelm and this time the man said he may want to rent and also had the conversation about a lost dog and one Wilhelm had seen by the Promenade Center. A perfectly reasonable inference from all of this is that the first explanation to Wilhelm in the unfinished unit was a pretext and the second conversation purely a cover to coincide with what he had been telling the girls the venture was about. A jury could at this point deduce that neither stated purpose was real, and the whole thing a ruse.

From the Promenade Center, they met again behind the Cleaners, the first location to which the man had initially directed the girls. (Had he been all along scouting the territory and, evicted from the duplex unit, decided to return to the rear of the Cleaners?) Here the bit about having Karen take off her shoes becomes an intriguing piece of the entire business. She had already earlier removed them once for his inspection while they were near the Promenade Center the first time. Such a repeti-

tion of professed inordinate interest in a child's tennis shoes surely suggests that it too is a ploy with something else in mind.

So, when the man kneels down in front of the shoeless child, makes a statement of what he is going to do in order "to see if she is clean" [19] and touches her genitalia, and then promptly rises to leave immediately in his car, a permissible deduction is that he did so with the intent to arouse and gratify his own sexual desire.

Finally, his parting comment, that he would meet Karen the next day at a given time, indicates clearly that this forty one year old man had in mind a repeat performance—one having nothing to do with a lost dog or renting a duplex.

We adhere to the general proposition reiterated in *Bowles v. State*, 550 S.W.2d 84 at 85–86, and hold that in a prosecution under § 21.11(a)(1) as well as one pursuant to § 21.11(a)(2), the requisite specific intent to arouse or gratify the sexual desire of any person can be inferred from the defendant's conduct, his remarks and all surrounding circumstances. See also *Turner v. State*, 600 S.W.2d 927 (Tex.Cr.App. 1980). Accordingly, we find that the State discharged its burden of proving, and that the jury had before it sufficient evidence to support its conclusion that the man, who it found to be appellant, touched the genitals of Karen with the specific intent to arouse and gratify his sexual desire. The first ground of error is overruled. *Turner v. State*, supra, and *Bowles v. State*, supra.

In his second ground of error appellant complains that the trial court erred in overruling his motion for a directed verdict at the close of evidence. Particularly, appellant contends that since he did not testify, the State, having elicited from its witnesses his representation that he was a child's doc-

---

**18.** Karen did not indicate whether they were at the front or rear of the Promenade Center the first time or if the man rattled the front or back doors when they went there a second time. But no matter, since the man practically had to go back to it because Wilhelm reported, according to Karen, that he had seen a doggie near the center. In truth, then, the man did not originate the second visit there.

**19.** Through an instruction given by the trial court, exactly as specially requested by appellant, the jury found that the statement, "I want to see if you are clean," was untrue.

tor and his remark that he wanted to or was going to see "if she were clean" as he touched the genitals of Karen, had the burden of proving their falsity. He cites *Otts v. State*, 135 Tex.Cr.R. 304, 116 S.W.2d 1084 (1938); commendably acknowledges that *Simon v. State*, 480 S.W.2d 439 (Tex.Cr.App. 1972) is "contra;" and says *Grady v. State*, 466 S.W.2d 770 (Tex.Cr.App.1971) is distinguishable. For its part, the State naturally relies on *Simon v. State*, supra, and *Asner v. State*, 138 Tex.Cr.R. 420, 136 S.W.2d 822 (1939), but from *Grady v. State*, supra, asserts that a statement made as a means of committing or furthering an offense is not exculpatory, and argues that the representation and remark by appellant "is res gestae as part of the criminal act of indecency with a child, *Romans v. State*, 153 Tex.Cr.R. 474, 220 S.W.2d 891 (Tex.Cr.App.1949)" which "does not per se negate the culpable intent that appellant touched the child to arouse and gratify his sexual desire." Though it does not support the last quoted assertion with authority, we agree essentially with the State.

As controlling value the *holdings* of *Otts, Simon* and *Asner* may be quickly dismissed for, while each contains general statements going into some aspect of the problem, the question in each was precisely whether failure of the court to charge on the law of exculpatory statements constituted reversible error: *Otts*, at 1086; *Simon*, at 443–444; *Asner*, at 827, 828. As we have already pointed out, *ante*, at n. 19, in the case at bar such in instruction, just as requested by appellant, was given, and the jury found the remark untrue. The *Otts* question, therefore, is not in the case.

■ Still, "[t]he rule is well settled that where the State introduces an exculpatory statement or confession of a defendant it is then bound to disprove it and failure to do so is grounds for acquittal," *Grady v. State*, supra, at 771. Thus, whether the trial court erred in overruling the motion

for directed verdict depends what application of law it made to the evidence after both parties had closed. Having related the latter and inferences reasonably drawn therefrom in ruling on ground of error one, we need not reiterate them.[20] As to the law applied by the trial court, while the record shows that it merely stated the motion was overruled, the trial court is presumed to have found good cause for doing so, *Wyatt v. State*, 566 S.W.2d 597, 602 (Tex.Cr.App.1978). But there are valid bases for overruling the motion for directed verdict.

■ First, the trial court would have been justified in concluding that the statement to Karen was "a means of committing the offense;" "a statement made for the purpose of committing a crime is not an exculpatory statement," *Grady v. State*, supra, at 771; see also *Peaden v. State*, 491 S.W.2d 136, 139 (Tex.Cr.App.1973). Such contemporaneous declarations may be regarded as "an effort and scheme to shield himself from the force and effect of his presence at the scene" of the offense, *Gibson v. State*, 53 Tex.Cr.R. 349, 110 S.W. 41, 48 (1908).

■ Second, the trial court could have concluded, as the jury would that the statement was untrue. "The term 'exculpatory' is defined as clearing or tending to clear from alleged fault or guilt. *Brown v. State*, 475 S.W.2d 938, 955," *Davis v State*, 501 S.W.2d 101, 103 (Tex.Cr.App.1973); but the State is not required to disprove an utterance of the accused adduced by it unless, *if true*, the statement tends to exculpate or exonerate the accused. *Medina v. State*, 164 Tex.Cr.R. 16, 296 S.W.2d 273 (1956) and cases cited at 274.

■ Finally, that appellant was truly asserting a purpose to see if the genitals of the child were clean does not reasonably rule out a lascivious intent—an intent to

---

**20.** The statement made by appellant as he went to touch Karen is a part of the transaction itself and, as such, was admissible. *Romans v. State*, supra, at 894: in prosecution for assault with intent to rape admissible as part of the res gestae was testimony that during the time of his attack the assailant said, "Here Kid, let's go the other way, someone will see."

arouse and gratify his sexual desire in the doing.[21] Given the immediate context in which the statement was made and the circumstances surrounding the occurrence, an issue of fact was raised that presented a jury question, not a matter of law, which the court determined to submit to the jury. In this we cannot say the court erred. *Windom v. State*, 429 S.W.2d 488 (Tex.Cr.App. 1968); *Hignett v. State*, 170 Tex.Cr.R. 342, 341 S.W.2d 166, 170 (1960). The second ground is overruled.

With respect to punishment there are complaints of an exchange during crossexamination of appellant initiated by a question whether appellant was under the care of a psychiatrist and two lines of argument to the jury run by the prosecutor. We perceive error in the fifth ground of error and, perforce, will not discuss the others, for in the event of a retrial they are not likely to occur.[22]

---

**21.** Of course, even true statements consistent with guilt may not be exculpatory. *Mosely v. State*, 354 S.W.2d 391, 394 (Tex.Cr.App.1962) and cases cited in original opinion, especially *Steen v. State*, 158 Tex.Cr.R. 77, 253 S.W.2d 279, 282 (1952 on rehearing): "It will be noted that every fact included in the statement could have been true and still appellant would be guilty ..." Thus, looking for, seeing and finding a clean condition in the genitals of a child may, for one so inclined, serve to heighten the level of arousal and gratification of his sexual desire.

**22.** Over objection appellant was compelled to reveal that he was presently seeing a psychiatrist, but it developed the consultations were for current stress, not for any past misconduct such as the instant offense. Thus, in the event of a new trial we may anticipate that the State will have no reason to pursue this matter.

Appellant objected to statements made by the prosecutor to the effect that after thinking about "the facts of this case, about this man" he submitted "a proper punishment" would be ten years confinement, that "I think the facts call for nothing less." Appellant sees this as a representation to the jury of "his superior qualifications to determine the proper punishment based on the facts of the case as he knew them," rather to the facts of the case in evidence. While we are without benefits of hearing the manner in which the words were spoken and the like, we do not read that imputation into the statements, and doubt the jury understood them that way.

In this closing argument on punishment the assistant district attorney first noted appellant had not presented character witnesses[23] and then recounted certain musings he indulged himself as counsel for appellant argued to the jury, *viz*:

"MR. TALIAFERRO: Mr. Smith has argued to you long and hard that this man that you found guilty of fondling a child should be turned loose on probation. And I listened to his testimony on his application for probation, and I noted in my mind the people who didn't testify that he should be turned loose on probation, people he didn't call for it. I thought he might call forward a minister to say that if he's released on probation he'll be welcomed in his church. I thought that he might call on an old college classmate to say that, 'We're still friends and chums.' I thought he might call his employer up here to say that, 'Even if you're convicted, you're welcome back to our place of

---

**23.** The prosecutor "noticed" what evidence the defense brought and did not bring, particularly "they didn't bring you a single witness to say ... [appellant ...] has a good reputation in this community for being a peaceful and lawabiding citizen." That theme was developed, followed by an objection and ruling:

"No one said he had a good character. Not a single witness, and they're entitled to call witnesses for that purpose. No one came forward.

MR. SMITH: Your Honor, we object to that because the State is also entitled to call character witnesses, if his reputation is bad.

THE COURT: You made your point. Overruled."

We must observe that the former district attorney representing appellant is generally correct for, according to one scholar, "It is commonly stated that the character of a person ... is presumed to be good until impeached," though it seems doubtful "there is any true presumption in regard to good character," for, as he opines, "All that the courts mean is that since persons are usually of normal moral character, it would be a foolish waste of time to prove that which may be assumed to exist." Nevertheless, the inevitable exception here is that an accused may offer evidence with respect to the particular character trait involved in the charge. See Ray, Law of Evidence §§ 91 and 771, 1 Texas Practice 132, 650. Furthermore, by terms of the statute character and general reputation are issues at the punishment hearing. Article 37.07, § 3(a).

business in good graces.' I thought he might call a neighbor up here and say that, 'Even if Mr. McKenzie's placed on probation, he's still welcomed in our neighborhood. We still want him living next to us with our family and children,' and so on. I thought they might call a parent up here to say that they'd make a little girl available to molest, but they didn't call anybody like that, anymore than they called—

MR. SMITH: Your Honor, we object to that line of argument. It is completely improper. It's highly prejudicial, the last remark he made about calling somebody up here to offer their little girl to molest, and we object to it.

THE COURT: Sustained.

MR. TALIAFERRO: Probation—

MR. SMITH: We ask that the Jury be instructed not to consider it.

THE COURT: The Jury will disregard the last sentence made by—

MR. SMITH: Now we ask for a mistrial. It's prejudicial.

THE COURT: Overruled."

The State now undertakes to justify its line of argument by citing only *Winkle v. State*, 506 S.W.2d 891 (Tex.Cr.App.1974) where the Court restated that "the prosecution has the right to comment on the accused's failure to call *competent* and *material* witnesses," id., at 897.

█ There are authoritative cases granting the prosecution the right to comment on the failure of an accused to call "*any*" witness to attest to his good reputation," *Scarborough v. State*, 171 Tex.Cr.R. 83, 344 S.W.2d 886, 890 [24] (1961); *Burnett v. State*, 162 Tex.Cr.R. 1, 280 S.W.2d 260, 263 [25] (1955); *Taylor v. State*, 157 Tex.Cr.R. 124, 247 S.W.2d 127, 128 [26] (1952); *Overby v. State*, 92 Tex.Cr.R. 172, 242 S.W. 213 (1922).[27] Thus, a correct statement of the

**24.** "They didn't choose to call one person who can tell you that Ike Newman Scarborough is a person of good reputation for being a peaceable law-abiding citizen."

**25.** "[T]he defendant had filed an application for a suspended sentence . . . , but had not brought a single witness to show the jury what kind of a man he was."

**26.** "[S]he couldn't bring forward one single, solitary witness to you that said her reputation was good for being a peaceable and law abiding citizen. Not one single, solitary witness did she bring in here."

**27.** Evolution of the "right" is interesting and, as is often the case, the current shorthand rendition of the rule masks any elements that qualify its application. Originally, before there was any suspended sentence law for an accused to invoke and thereby put his general reputation in issue, the law forbade an argument calculated to taint the character of an accused unless that matter had been put in issue, e. g., *Stephens v. State*, 20 Cr.R. 255 (Ct.App.1886). Contemporaneously, however, with respect to a contested issue in the trial on the merits, it was not error to permit the prosecuting attorney to comment on failure of an accused to call his wife, father or other person who the evidence showed had knowledge of some defensive factual contention and was available to testify, e. g., wife, *Mercer v. State*, 17 Cr.R. 452 (Ct.App.1885); father, *Crumes v. State*, 28 Cr.R. 516, 13 S.W. 868 (1890); eyewitness friends, *Mayes v. State*, 33 Tex.Cr.R. 33,

24 S.W. 421 (1893); and see the host of similar applications annotated at 12 Texas Digest 659 ff, Criminal Law § 721½(1) and (2). Yet, as in *Winkle*, itself, and other cases cited in applying the doctrine, the Court usually notes from the record how it is that the missing witness was competent and in a position to give material testimony; see, e. g., bartender who served beer to accused, *Schultz v. State*, 367 S.W.2d 688, 690 (Tex.Cr.App.1963); persons at service station visited by accused, *Johnson v. State*, 170 Tex.Cr.R. 381, 341 S.W.2d 453, 454 (1960); known witnesses to offense, *Batiste v. State*, 462 S.W.2d 30, 31 (Tex.Cr.App.1971); a named woman telephoned by accused, *Joines v. State*, 482 S.W.2d 205, 207 (Tex.Cr.App.1972); a person accused claims committed the offense, *Rodgers v. State*, 486 S.W.2d 794, 797 (Tex.Cr.App.1972): "It is the rule that State's counsel may comment on the failure of an accused to call particular witnesses in his behalf, absent a showing that such witness was incompetent to testify, or that by the exercise of due diligence, could not have secured his attendance as a witness." To the same effect are *Barker v. State*, 170 Tex.Cr.R. 226, 339 S.W.2d 674, 676 (1960); *Curtis v. State*, 167 Tex.Cr.R. 536, 321 S.W.2d 587, 590 (1959); see also 56 Tex.Jur.2d 599, § 261: "Counsel may comment in argument on the opposing party's failure to call as a witness one who is competent, available, and in possession of material information on the matter in issue."

With the suspended sentence law in effect, the Court held an application by an accused extended an invitation to the State to introduce

doctrine is that the prosecutor properly may comment on the failure of the accused to call to attest to his reputation any witnesses at all or some particular known witness who is competent to give material testimony on the matter. With this statement of the rule in mind, we now examine the facts against the line of argument to which objection was made.

Appellant has testified on or about February 15, 1978 that he formerly lived in Round Rock in 1976, moved to San Antonio, and after an unspecified period then lived at an address in Austin's Northwest Hills; four months before his trial he married [28] a woman with two children, two boys, one five and the other four years of age, and bought a home "about a week ago" and moved into it. There is no intimation in this record that appellant or any member of his family belonged to or attended any church. Appellant did not claim to have matriculated at a college or university, and there is no evidence that he did.[29] At the time he testified appellant was employed by a state agency, and had been for more than four years; his supervisors were aware of his situation and had told him that if placed on probation his employment would continue.

Who the assistant district attorney "thought" appellant might call to testify and what each was expected to say were, for the most part, simply personages and products of his own imagination.[30] Thus, so far as this record shows, there was no minister to welcome appellant to church; there was no "old college classmate" to say he and appellant were still friends and chums; while appellant and his family probably had neighbors, having just bought his home only a week before appellant may not have even met one, much less been acquainted well enough to ask if neighbors "still want him living next to us *with our family and children*"—as to the latter of which there is absolutely no evidence. The prosecutor may not relate his version of testimony a witness not called might give. *Fisher v. State*, 511 S.W.2d 506, 507[31] (Tex.Cr.App. 1974).

Finally expressing the "thought" that "they might call a parent up here to say they'd make a little girl available to molest" was the cruelest cut of all. Just before his

---

evidence of his general reputation, *Baker v. State*, 87 Tex.Cr.R. 308, 221 S.W. 607, 609 (1920), since it thereby became an issue, *Williamson v. State*, 74 Tex.Cr.R. 289, 167 S.W. 360, 361 (1914). So it was soon fashionable for the prosecutor to comment on total failure of an accused to present reputation testimony and, as *Scarborough v. State*, supra, holds, to do so was not error. Still, as in the character witness situation, the authorities cited by the Court go through *Taylor v. State*, supra, back to *Overby v. State*, supra, in which particular prospective witnesses were identified, having been subpoenaed by the defendant, himself. In *Overby v. State*, supra, the Court stated:

"... The general reputation of appellant being a pertinent issue, and it appearing ... that he had present at court a number of witnesses whose testimony would have borne upon this issue, in line with all the authorities it was not erroneous for the state's attorney to comment upon appellant's failure to introduce witnesses whom he had summoned and who were present for the purpose of giving evidence upon said question of reputation."

28. A prior marriage in 1958 produced two children, but it was dissolved by divorce in 1965; appellant said he was current in child support payments.

29. Appellant had been a draftsman technician with a state board for three and a half years. He then moved over to another state office to work as "a civil engineer," but if that term implies he became a professional engineer we note that practice act does not require a graduate degree for registration, see Article 3271a, V.A.C.S.

30. Though his state employer did not testify, appellant himself had stated his supervisors had given assurance that he would retain his job if placed on probation.

31. Without deciding the question, we entertain serious reservations as to the admissibility of such testimony suggested by the State. Each instance would appear to be merely an expression of personal views or opinion concerning appellant, providing the jury with nothing about reputation and only obliquely something going to his general character, but to no particular trait. See Ray, Law of Evidence § 1324, 1A Texas Practice 500–501. And even if the persons mentioned did exist, of what probative value is it for the jury to hear them simply speak well of appellant?

line of "thought" argument the prosecutor had referred to the lack of reputation witnesses, so that was not his point. These comments, way outside the record, were certainly not invited, as the State now contends, by argument of appellant that "we are asking for probation in this case, and I don't think under these circumstances it is unreasonable." [32] The last expression made clear what the statements that immediately preceded the remark surely suggested: The prosecutor was engaging in heavy sarcasm, making appellant out as a pariah—a person deservedly shunned by his minister, his old college classmate, his neighbors and parents of small children, though there was no evidence whatsoever to support the branding.

 Proper jury argument is that which summarizes the evidence, makes reasonable deductions from the evidence, responds to argument of opposing counsel and pleads for law enforcement. *Todd v. State*, 598 S.W.2d 286, 296–297 (Tex.Cr.App.1980). For a prosecutor to argue outside the record and inject personal opinion is improper. *Romo v. State*, 593 S.W.2d 690, 694 (Tex.Cr.App.1980); *Hurd v. State*, 513 S.W.2d 936, 941 (Tex.Cr.App.1974). Such is the essence of the argument under consideration, and we find it off limits. See *Berryhill v. State*, 501 S.W.2d 86, n. 1 (Tex.Cr.App.1973).

Still, this Court "should not hold an argument to be reversible error unless it is in extreme cases where the language complained of is manifestly improper, harmful and prejudicial . . . , *Vineyard v. State*, 96 Tex.Cr.R. 401, 257 S.W. 548, 550 (1922); *Todd v. State*, supra. In our best judgment this argument was all of that and, for much of the same reasons advanced in *Irving v. State*, 573 S.W.2d 5, 6 (Tex.Cr.App.1978), "we are not left free to speculate that the error in the prosecutor's argument had no effect on the punishment assessed by the jury," as well as its rejection of probation for which appellant, with his impeccable

background, was fully eligible. Particularly is the principle applicable where, as here, evidence of guilt is meager though sufficient.[33]

Accordingly, the last ground of error is sustained.

The judgment is reversed and the cause remanded.

DALLY, J., concurs in result.

---

**32.** The circumstances had just been stated and were all borne out by testimony. The argument was not objectionable.

**33.** We also note that over objection the prosecutor was permitted to state "as a member of

the District Attorney's Office" that he "considered" a proper punishment was a stated term of confinement. Cf. *Atwood v. State*, 537 S.W.2d 749, 750 (Tex.Cr.App.1976).