

# In the
# Court of Appeals
# Second Appellate District of Texas
# at Fort Worth

_____

No. 02-17-00118-CR

_____

RONNIE JAMES MONROE, Appellant

V.

THE STATE OF TEXAS

On Appeal from Criminal District Court No. 2
Tarrant County, Texas
Trial Court No. 1491623R

Before Sudderth, C.J.; Meier and Kerr, JJ.
Opinion by Justice Meier

## MEMORANDUM OPINION[1]

## I. INTRODUCTION

This is an indecency-with-a-child-by-contact case wherein appellant Ronnie James Monroe appeals his conviction and life sentence. In three issues, Monroe argues that the evidence is insufficient to demonstrate a culpable mental state, that some of the court costs imposed in the trial court's judgment should be deleted or reduced, and that the trial court's judgment incorrectly reflects that the jury found the State's repeat-offender notice to be true. Because we conclude that sufficient evidence exists that Monroe intended to commit the offense, that Monroe is not entitled to a reduction in court costs, and that it was error for the trial court to enter a finding of true to the repeat-offender notice,[2] we will modify the trial court's judgment to remove the repeat-offender finding and will affirm the trial court's judgment as modified.

---

[1]*See* Tex. R. App. P. 47.4.

[2]The jury found the State's sex-offender notice to be true, enhancing the punishment range for the offense from a maximum of twenty years to a mandatory life sentence. *See* Tex. Penal Code. Ann. § 12.42(c)(2)(B) (West Supp. 2017). Therefore, it was proper for the jury to assess a life sentence regardless of the repeat-offender finding and our modification of the judgment does not impact Monroe's sentence.

## II. BACKGROUND

At trial, Mother[3] testified that she began dating Monroe right before Christmas 2013. She met him on a social website, and he moved in with her and her two children sometime around June 2014. Mother averred that on June 11, 2016, she, Monroe, Girl, and Boy attended a family reunion at a nearby lake. Girl was six years old at the time.

According to Mother, the group left the reunion just after dark and stopped at a local gas station so that she and Girl could use the restroom and Monroe could fill the vehicle with gas. Mother said that after she used the toilet, Girl then attempted to do the same. By Mother's account, as Girl was pulling down her pants, Mother glanced toward Girl and Girl "tried to cover . . . up real fast to hide." Mother said that she asked Girl, "What's going on?" Mother stated that she then inspected Girl's underwear, discovered what she believed to be blood, and questioned Girl further, to which Girl responded, "Sometimes when you're not home [Monroe] touches me." In response, Mother and Girl went to the car while Monroe finished filling up the vehicle. Mother then drove the group away from the gas station. Mother said that she first attempted to contact her brothers so that one of them would "beat" Monroe.

---

[3]To protect the child complainant's anonymity, we refer to children and family members by aliases. Tex. R. App. P. 9.8(b) & cmt., 9.10(a)(3); *McClendon v. State*, 643 S.W.2d 936, 936 n.1 (Tex. Crim. App. [Panel Op.] 1982).

She was also driving erratically. Because of her erratic driving, Mother said that Monroe began to question her about why she was upset.

Mother said that eventually she declared to Monroe, "Well, you['ve] been touching my baby." Mother said that Monroe said, "No, I haven't," to which Girl said, "Yes, you have." Because she was unable to contact either of her brothers, Mother said that she then called 911. After speaking with the 911 dispatcher, Mother drove the car to a nearby 7-Eleven in order to meet up with police officers. Mother said that after meeting with the officers, she drove Girl to the Alliance for Children center. After someone from the center interviewed Girl, Mother then took Girl to Cook Children's Hospital for an examination. As Mother testified, the State introduced three pictures—one of Girl, one of Boy, and one of them both together. According to Mother, these pictures would have been viewable to Monroe from the social website when Mother met him. The State also introduced, and the trial court admitted, pictures of Girl's underwear, showing the apparent bloodstain that initially alarmed Mother. And the State also introduced, and the trial court admitted, the underwear.

Detective Brent Kessler of the Fort Worth Police Department testified that after officers went to the 7-Eleven, one of the officers told Kessler that Monroe wanted to talk to the police. Kessler averred that he instructed officers to take Monroe to the Alliance for Children center for an interview. According to Kessler, in

4

the interview, Monroe stated that he had been "rubbing" on Girl's vaginal area but not under her clothes. Monroe also told Kessler that this conduct had begun two days prior to Girl's outcry and had lasted for five seconds, but he said that he stopped because his conscience got to him.

The State introduced recorded portions of Kessler's interview with Monroe. During the interview, Monroe admitted that he had been molested as a child. He further admitted that he has "urges" to touch children, that he sometimes feels that he needs help to control these urges, and that these urges were a part of the reason he drinks excessive amounts of alcohol. When Kessler asked whether Monroe had been molesting Girl, Monroe said, "I probably feel that I have been doing it," "but I don't know." When Kessler told Monroe that the evidence already showed that something had happened between him and Girl, Monroe responded, "I just want to get somewhere that I can get help." When Kessler asked what "urges" he was fighting, Monroe said that he would not sexually assault a child but that he might have been "fondling them or stuff like that." Although never expressing exactly what took place between him and Girl, Monroe stated that what had transpired had "just recently started happening" and that something had "clicked in [his] mind" recently. He also attributed what had transpired as being due to a lot of stress, his heavy drinking, and his having a tumor in his head. He then admitted that he had been "rubbing" on Girl "but not under her clothes." He also said that his interaction with Girl was his "first

5

one" and that he had not acted on his urges with any other children. He also said that "it just started like two days ago." When Kessler asked if he had used anything other than his fingers, Monroe said "no." He then described what happened as having only lasted five seconds. Monroe says that what made him stop was his conscience. When Kessler asked whether all he had done was rubbed Girl's vagina, Monroe said "yeah." Monroe also declared, "I know that I'm going to jail."

Girl testified that Monroe had touched her in her "middle part" with his finger more than five times but that she did not know exactly how many times. Girl also averred that the touching occurred under her clothes and that the touching was inside her private area. On cross-examination, Girl averred that when Mother had inspected her underwear, Mother had said that there was blood on them, but Girl said that she did not see it herself.

Charity Garcia, a child forensic interviewer for Alliance for Children, testified that she interviewed Girl. Garcia said that Girl was initially reluctant to discuss the abuse and that Girl even initially denied anything had occurred. Garcia referred to Girl's disclosure as an "accidental disclosure" because Mother had discovered it by accident. But Garcia said that Girl did eventually disclose that Monroe had put his finger under her pants and underwear and had "put his finger in her pee pee." By Garcia's account, Girl said that he had done this to her in her bedroom and also in the living room. A copy of Garcia's interview was published for the jury. In the

interview, Girl said that Monroe had lived with the family for more than two months, that Monroe began touching her when Mother first met him, and that it continued through that day.

Christi Thornhill, a nurse practitioner for Cook Children's Medical Center, testified that she examined Girl in the early hours of June 12, 2016. Thornhill said that Girl told her that Monroe had touched her "private parts" with his finger inside her underwear, that he had done so "[t]oday," that he "did it all the time[]," that he did it "sometimes when [Mother] was asleep or when she was gone," and that "[i]t hurt" when he would do so. Thornhill averred that Girl specifically described that Monroe had penetrated Girl's labia with his finger.

A jury found Monroe guilty of indecency with a child. The parties then presented evidence at the punishment phase of trial. Having found the State's sex-offender notice allegation to be true, the jury assessed punishment at life imprisonment. The trial court rendered judgment accordingly, and this appeal followed.

## III. DISCUSSION

### A.    Sufficiency of the Evidence to Show Intent

In his first issue, Monroe argues that the evidence is insufficient to show that he intended to arouse or gratify the sexual desire of any person and that thus his conviction should be reversed. We disagree.

### 1. Standard of Review

In our due-process review of the sufficiency of the evidence to support a conviction, we view all of the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319, 99 S. Ct. 2781, 2789 (1979); *Jenkins v. State*, 493 S.W.3d 583, 599 (Tex. Crim. App. 2016). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319, 99 S. Ct. at 2789; *Jenkins*, 493 S.W.3d at 599.

The trier of fact is the sole judge of the weight and credibility of the evidence. *See* Tex. Code Crim. Proc. Ann. art. 38.04 (West 1979); *Blea v. State*, 483 S.W.3d 29, 33 (Tex. Crim. App. 2016). Thus, when performing an evidentiary sufficiency review, we may not re-evaluate the weight and credibility of the evidence and substitute our judgment for that of the factfinder. *See Montgomery v. State*, 369 S.W.3d 188, 192 (Tex. Crim. App. 2012). Instead, we determine whether the necessary inferences are reasonable based upon the cumulative force of the evidence when viewed in the light most favorable to the verdict. *Murray v. State*, 457 S.W.3d 446, 448 (Tex. Crim. App.), *cert. denied*, 136 S. Ct. 198 (2015). We must presume that the factfinder resolved any

8

conflicting inferences in favor of the verdict and defer to that resolution. *Id.* at 448–49; *see Blea*, 483 S.W.3d at 33.

To determine whether the State has met its burden under *Jackson* to prove a defendant's guilt beyond a reasonable doubt, we compare the elements of the crime, as defined by the hypothetically correct jury charge, to the evidence adduced at trial. *See Jenkins*, 493 S.W.3d at 599; *Crabtree v. State*, 389 S.W.3d 820, 824 (Tex. Crim. App. 2012) ("The essential elements of the crime are determined by state law."). Such a charge is one that accurately sets out the law, is authorized by the indictment, does not unnecessarily increase the State's burden of proof or restrict the State's theories of liability, and adequately describes the particular offense for which the defendant was tried. *Jenkins*, 493 S.W.3d at 599. The law as authorized by the indictment means the statutory elements of the charged offense as modified by the factual details and legal theories contained in the charging instrument. *See id.*; *see also Rabb v. State*, 434 S.W.3d 613, 616 (Tex. Crim. App. 2014) ("When the State pleads a specific element of a penal offense that has statutory alternatives for that element, the sufficiency of the evidence will be measured by the element that was actually pleaded, and not any alternative statutory elements.").

The standard of review is the same for direct and circumstantial evidence cases; circumstantial evidence is as probative as direct evidence in establishing guilt. *Jenkins*, 493 S.W.3d at 599.

### 2. Elements of the Offense

A person commits the offense of indecency with a child by contact if, with a child younger than seventeen years, the person engages in sexual contact with the child. Tex. Penal Code Ann. § 21.11(a)(1) (West Supp. 2011). "[S]exual contact" means the following acts if committed with the intent to arouse or gratify the sexual desire of any person: any touching by a person, including touching through clothing, of the anus, breast, or any part of the genitals of a child. *Id.* § 21.11(c)(1). A person acts intentionally with respect to the nature of the conduct or a result of the conduct when it is the person's conscious objective or desire to engage in the conduct or cause the result. *Id.* § 6.03(a) (West 2011). In the context of indecency with a child, the factfinder can infer the requisite intent to arouse or gratify the sexual desire from conduct, remarks, or all the surrounding circumstances. *See McKenzie v. State*, 617 S.W.2d 211, 216 (Tex. Crim. App. [Panel Op.] 1981). The intent to arouse or gratify may be inferred from conduct alone. *Id.* No oral expression of intent or visible evidence of sexual arousal is necessary. *Gregory v. State*, 56 S.W.3d 164, 171 (Tex. App.—Houston [14th Dist.] 2001, pet. dism'd), *cert. denied*, 538 U.S. 978 (2003).

### 3. Evidence of Monroe's Intent

Viewing the evidence in a light most favorable to the jury's verdict, the evidence supports that Monroe had a conscious objective or desire to engage in the conduct of touching Girl's genitals with his finger. Indeed, Girl told the forensic

10

interviewer that Monroe would touch her "sometimes when [Mother] was asleep or when she was gone." *See Gomez v. State*, No. 13-08-00157-CR, 2009 WL 2914262, at *6 (Tex. App.—Corpus Christi Aug. 31, 2009, no pet.) (mem. op., not designated for publication) (reasoning that appellant's acts of calling victim to his room when her cousins were asleep and touching her vagina are factors allowing a jury to infer intent to arouse). Moreover, Monroe initially denied touching Girl to Mother and to Kessler, from which the jury could have inferred a consciousness of guilt. *See Anderson v. State*, No. 05-09-00737-CR, 2011 WL 989052, at *4 (Tex. App.—Dallas Mar. 22, 2011, no pet.) (mem. op., not designated for publication) ("[T]he jury was permitted to take appellant's initial denial of involvement [in the crime] as proof of consciousness of guilt.") (*citing Bowden v. State*, 166 S.W.3d 466, 476 (Tex. App.—Fort Worth 2005, pet. ref'd)). The jury could have also inferred a consciousness of guilt from Monroe's statements that he continually fought "urges" of molesting children. *See Barcenes v. State*, 940 S.W.2d 739, 744–45 (Tex. App.—San Antonio 1997, pet. ref'd) (reasoning that post-incident statements by accused can indicate a consciousness of guilt). Furthermore, Monroe's statement to Kessler that he stopped the conduct because of his conscience also indicates a consciousness of guilt. And Monroe admitted to purposely rubbing Girl's vagina over her clothes, a statement made amid numerous statements by Monroe that he fought urges to molest children and that he believed he needed help. A reasonable factfinder could have inferred that

11

Monroe's remarks, conduct, and the surrounding circumstances of him having touched Girl's genitals was done with the intent to arouse or gratify himself. *See McKenzie*, 617 S.W.2d at 216. We overrule Monroe's first issue.

## B.     The Complained-of Court Costs

In his second issue, Monroe argues that certain costs enumerated in the bill of costs should be deleted or reduced from the trial court's judgment. Specifically, Monroe argues that the criminal records costs ($22.50) and the child abuse prevention costs ($100) should both be deleted from the trial court's judgment; he also argues that the DNA testing costs ($250) and the consolidated felony court costs ($133) should be reduced.[4] We disagree.

### 1.     Criminal Records Costs

Monroe first challenges the trial court's assessing a statutory $22.50 criminal records fee as a court cost, contending that the fee is facially unconstitutional. *See* Tex. Code Crim. Proc. Ann. art. 102.005(f)(1) (West 2018). The burden rests upon the individual who challenges a statute to establish its unconstitutionality, and we make every reasonable presumption in favor of the statute's constitutionality, unless

---

[4]Monroe does not articulate whether he is making a facial or as-applied challenge to these costs. But because Monroe only cites to *Salinas* and because the term "as applied" appears nowhere in his briefing, we will address his complaint as a facial challenge to the constitutionality of the statutes imposing these costs.

the contrary is clearly shown. *Peraza v. State*, 467 S.W.3d 508, 514–15 (Tex. Crim. App. 2015), *cert. denied*, 136 S. Ct. 1188 (2016).

A facial constitutional challenge attacks the statute itself as opposed to a particular application of the statute. *Id.* at 515. To prevail in a facial challenge, a defendant must establish that no set of circumstances exists under which the statute would be constitutional. *Id.*

Statutes assessing court costs must provide that the costs be allocated for legitimate criminal justice purposes lest they violate the separation-of-powers clause by functioning as a tax. *Id.* Thus, to successfully mount a facial challenge to a statutory court fee, an individual must show that the statute actually authorizes or prohibits conduct in violation of the Constitution. *Id.*

Here, Monroe argues that these costs are unconstitutional because the fee *may* be spent on "records management and preservation, including automation, in various county offices." And then, without citing any authority, giving any explanation for, or analyzing why, Monroe makes the conclusory statement that "[t]hus, [this court cost] is not for a legitimate criminal justice purpose." But Monroe does not even attempt to establish that no set of circumstances exists under which the statute would be constitutional. Furthermore, the *Peraza* court held that absent an as-applied challenge, when analyzing statutes imposing fees, courts should consider only those purposes actually contemplated by the statute. *See Peraza*, 467 S.W.3d at 514–15. Thus, a

13

challenge cannot demonstrate the statute is facially unconstitutional based on how the revenues *might* be spent in practice, which is at best what Monroe is arguing. *See id.* Following *Peraza*, we hold that Monroe has failed to establish that the fee imposed by article 102.005(f)(1) is a facially unconstitutional tax. We overrule this portion of Monroe's second issue.

### 2. Child-Abuse-Prevention Costs

Monroe next challenges the trial court's assessing a statutory $100 child-abuse-prevention fee as a court cost, contending that the fee is facially unconstitutional. *See* Tex. Code Crim. Proc. Ann. art. 102.0186 (West 2018). Much like his previous argument, Monroe makes the conclusory claim that this fee is not related to a legitimate criminal purpose. But this court has held multiple times that article 102.0186 is facially constitutional. *Horton v. State*, 530 S.W.3d 717, 725 (Tex. App.—Fort Worth 2017, pet ref'd); *Ingram v. State*, 503 S.W.3d 745, 749 (Tex. App.—Fort Worth 2016, pet. ref'd). We hold, as we have consistently held before, that article 102.0186 is facially constitutional. We overrule this portion of Monroe's second issue.

### 3. DNA Testing Costs

Monroe next challenges the trial court's assessing a statutory $250 DNA testing fee as a court cost, contending that the fee is facially unconstitutional. *See* Tex. Code Crim. Proc. Ann. art. 102.020(a)(1), (h) (West 2018). But the Texas Court of Criminal Appeals has already held that the entirety of the DNA testing fee is "expended for

legitimate criminal justice purposes" via interconnected statutory provisions. *Peraza*, 467 S.W.3d at 519–20. Monroe cites no authority to the contrary, and we decline his invitation to rule contrary to the court of criminal appeals. We overrule this portion of Monroe's second issue.

### 4. The Consolidated Court Costs

Finally, Monroe challenges the trial court's assessing a statutory $133 court costs fee and again contends that the fee is facially unconstitutional. *See* Tex. Loc. Gov't Code Ann. § 133.102(a)(1) (West Supp. 2017). We agree, but we are bound by precedent to leave these costs intact.

In *Salinas v. State*, 523 S.W.3d 103, 108–09, 110–11 (Tex. Crim. App. 2017), the court of criminal appeals partially upheld the same argument Monroe now advances. In *Salinas*, the court declared section 133.102 facially unconstitutional in violation of the separation of powers clause of the Texas constitution to the extent it allocates funds from the consolidated fees to the "comprehensive rehabilitation" account and the "abused children's counseling" account because these subsections do not serve a "legitimate criminal justice purpose." *Id.* (invalidating portions Tex. Loc. Gov't Code Ann. § 133.102). We therefore sustain Monroe's point to the extent that he complains of the allocation of funds under this subsection.[5] But we do not agree that Monroe is

---

[5]Effective June 15, 2017, two months after Monroe's conviction, the legislature amended section 133.102(e) to remove the two accounts deemed unconstitutional from the statute, but the consolidated court cost fee remains at $133. *See* Act of May

15

entitled to the relief he seeks.  In *Salinas*, the court of criminal appeals held against retroactive application of its holding and emphasized that only those cases pending in its court as of the date of the opinion were appropriate for relief.  *Salinas*, 523 S.W.3d at 112–13.  Otherwise, the *Salinas* holding applies prospectively to "trials that end after the date the mandate in the present case issues."  *Id.* at 113.

Here, Monroe was convicted on April 7, 2017.  He did not have a petition for discretionary review raising this issue pending in the court of criminal appeals at the time the *Salinas* opinion issued.  *See Salinas*, 523 S.W.3d at 103 (handed down March 8, 2017).  Mandate in *Salinas* issued on June 30, 2017.  *Hurtado v. State*, No. 02-16-00436-CR, 2017 WL 3188434, at *1 (Tex. App.—Fort Worth July 27, 2017, no pet.) (mem. op., not designated for publication) (observing *Salinas* mandate).  As such, the *Salinas* holding does not apply to Monroe's case.  We overrule this portion of Monroe's second issue.

## C.    Repeat-Offender Notice

In his third issue, Monroe argues that the trial court's judgment incorrectly reflects that the jury found the repeat-offender notice to be true.  The State concedes this point.  And our review of the record indicates that the jury did not make such a finding and that it was therefore error by the trial court to enter it in its judgment.

---

18, 2017, 85th Leg. R.S., ch. 966, 2017 Tex. Sess. Law. Serv. 3917, 3917–18 (West) (codified at Tex. Loc. Gov't. Code § 133.102(a), (e)).

Thus, we sustain Monroe's third issue and modify the trial court's judgment to reflect that the jury found the repeat-offender notice to be not true.

## IV. CONCLUSION

Having overruled Monroe's first issue, having overruled the dispositive portions of his second issue, and having sustained his third issue, we modify the trial court's judgment to reflect that the jury found the repeat-offender notice to be not true and affirm the remainder of the trial court's judgment.

/s/ Bill Meier
Bill Meier
Justice

Do Not Publish
Tex. R. App. P. 47.2(b)

Delivered: September 13, 2018