Clifton Wayne FOUNTAIN, Appellant,

v.

The STATE of Texas, Appellee.

Nos. B14-83-446CR, C14-83-447CR.

Court of Appeals of Texas,
Houston (14th Dist.).

Nov. 15, 1984.

Rehearing Denied Dec. 6, 1984.

Larry Urquhart, Moorman, Tate, Moorman & Urquhart, Brenham, for appellant.

Charles J. Sebesta, Jr., Caldwell, for appellee.

Before PAUL PRESSLER, ROBERTSON and ELLIS, JJ.

### OPINION

ROBERTSON, Justice.

Appellant was indicted for murder and attempted murder. Trial for both offenses was consolidated; the jury rejected his plea of not guilty and assessed punishment of forty years on the murder and fifteen years on the attempted murder. The issues on appeal are identical; the appeals

have, therefore, been consolidated. Appellant challenges the sufficiency of the evidence, the court's charge, the admissibility of evidence of extraneous offenses and the admissibility of a note written by the injured person in the attempted murder case. We affirm.

In his first ground of error, appellant challenges the sufficiency of the evidence to sustain the conviction. This is a circumstantial evidence case. We must review the evidence and determine whether, viewed in the light most favorable to the jury's verdict, any rational trier of fact could have found the essential elements of a crime beyond a reasonable doubt. *Hudson v. State*, 675 S.W.2d 507 (Tex.Crim. App.1984). The apparent theory upon which this case was tried was that appellant intended to have his step-son killed in order to collect on a life insurance policy. Appellant did not testify and called only one witness in his behalf—an inmate in the Burleson County jail at the same time appellant and his co-defendant Douglas Kingery were confined. His testimony was in rebuttal to that of Jerry Redding, another jail inmate, who testified as a witness for the state concerning certain conversations between appellant and Kingery which he overheard. Except for possible conflicts in this testimony, there is no dispute in the evidence. In order to properly weigh the evidence, it is therefore necessary to detail all the facts and circumstances heard by the jury.

Appellant was the step-father of Russell Wayne Hodde, aged twenty-five and the complainant in the attempted murder case, Arthur Scott Hodde, aged twenty and John Hodde, aged seventeen. While the record is unclear as to the exact dates, the mother of the boys was divorced from her previous husband in 1978 and very soon thereafter she married appellant. In her divorce, Dorothy (the mother) received the home and some "40 or 50 acres" of land and was described as being in "very good financial condition." Appellant was in the custom carpentry business. Dorothy "invested, underwrote" appellant's business ventures and became "heavily in debt." Testimony indicated she had sold all the land except 12 to 15 acres which was mortgaged. The financial condition of appellant and Dorothy was described as "very, very bad, critical". Approximately three years before this offense, appellant and Dorothy had purchased life insurance on each of the three sons in the amount of $25,000—each policy containing a double indemnity provision, with Dorothy as primary and appellant as secondary beneficiary. Appellant remarked to Russell on several occasions (the last being within the three week period prior to this offense) that he "better be careful, I've got that insurance." (Appellant contended at trial—through cross-examination—these statements were made in jest. This was a fact for the jury to decide. We point it out only as another circumstance that "any rational trier of fact" *could* consider).

Approximately three weeks prior to the offense, appellant left Brenham, where he had been carpentering, because of no work. He went to Austin, taking with him two of his step-sons, Russell and Scott, and a friend of Russell's, John David Howell (the deceased in the murder case). Scott returned to Brenham after about two weeks. To complete the work crew three additional employees were hired in Austin, one of whom was Douglas Kingery. Kingery, an ex-convict and living in a half-way house, was hired "about February 1" prior this offense on February 18. It appears Kingery was required to spend his nights at the halfway house, but appellant "went out" with him a couple of times when no one else was along.

On February 18, 1983 appellant set up plans whereby Kingery, Russell and Howell were to help him "make a drug deal." Kingery, Russell and Howell were to precede appellant to the "Old River Bridge" on Highway 50 in Burleson County, where they would park and wait for appellant. Appellant was to follow by "about 45 minutes" and he would then make contact with a drug dealer. Appellant would then give them "further instructions about where he

wanted them to set up to meet the connection when he came to deliver the 10 pounds of marijuana." When he arrived, they would "take the marijuana," tie up the dealer, and "Kingery was supposed to be there for our protection." Kingery would be armed with the 12 gauge shotgun which appellant had shortly before "instructed" Russell and Howell to purchase. They would then either divide the marijuana or sell it and divide the proceeds.

After work, "5:30 or so" Russell and Howell serviced the van, picked up Kingery at the halfway house and headed for the pre-arranged meeting place. When they arrived, they parked the van off the road and down the embankment where they waited for "an hour and a half, two hours" before they heard appellant's "GMC four wheel drive Jimmy" approaching. They walked up the embankment toward the highway, with Kingery carrying the shotgun. Appellant, alone in the vehicle, continued driving across the bridge a short distance where he turned around and in "a minute or so" came back. In the words of Russell: "He started to pull over and when he saw the three of us standing there he jerked the vehicle back on the road and took off as fast as the vehicle would allow." The three of them then went back down to the van "going to get in the van and go see what was wrong or what the problem was." Just as Russell was about to enter the van "Kingery started shooting." The first shot hit Russell in the face "taking the gums and 10 or 12 teeth." He heard two more shots as he "went down." Fighting to regain consciousness, he saw Kingery "beating John David (Howell) with the shotgun as a club." Russell "gained enough strength and ran," using a half t-shirt he had on as a compression bandage to stop the bleeding. He observed Kingery "cross the road twice and go over the bridge looking for me." Russell testified that he "started to flag down help, but didn't do so because I was afraid Sandy (appellant) was still in the area and he'd kill me." As a result, he found a haystack and spent the night in it. The next morning he returned to his van and found Howell,

dead, where Kingery was beating on him. He then flagged down a "sergeant" and, being unable to talk, wrote two notes to the sergeant, who "had me follow him to a house close by where the sheriff and an ambulance was called." The broken shotgun, identified by Russell as the one he and Howell purchased for appellant, was later found in a nearby field.

The jury heard additional evidence concerning the following:

1. This was not the first time appellant had set up the proposed marijuana transaction. In the approximately three weeks to a month they had been in Austin, appellant had gotten Russell and Howell to twice previously go to the same general area in the middle of the night for the ostensible purpose of robbing the dealer of his marijuana. On the first occasion—some 20 days previously Russell and Howell proceeded in the van and appellant and his step-son, Scott, followed in the GMC "Jimmy." When they arrived at the bridge, Scott was left with Russell and Howell while appellant "went to call his connection." Appellant returned in 15 or 20 minutes, informed them no drugs were available and they all returned to Austin. The second time—some 10 days previously to the 18th—Russell and Howell proceeded in the van to a prearranged place "off of Highway 50" and appellant appeared alone about an hour later. For some reason Howell took the shotgun out of the van and gave it to appellant. They all remained there approximately an hour and a half, but the "drug connection" never appeared. Appellant turned the "Jimmy" around, pulled back up on the road and then "got out a broom and swept out the tracks of the Jimmy" but did not sweep the van tracks. He finally left and then Russell and Howell left.

2. Appellant had an "18 wheel" truck "underwritten" by Dorothy, that was used to haul produce. Several months before the shooting, appellant was behind several months in payments on the truck and he told Russell "he would like to have the truck stolen. That he wouldn't make any

money off of it, but at least they could recover the investment that they had put into it. And then he also at another time, he said, you know, he'd like to run it off a cliff also because of the same reason, he could collect the insurance on it." The truck was repossessed after appellant was confined shortly after the commission of this offense.

3. Shortly after the conversation between appellant and Russell concerning the truck, appellant offered Russell $1,000 to burn their home. The first plan offered by appellant was for Russell "to take gas, pour it through the back of the house into the hallway, through the bedrooms and to make a big puddle of gas on the bed and to leave the gas can in the middle of it" because "he wanted to make it look like my father did it." The reasons appellant gave for wanting the house burned was "to collect the insurance on it." and then rebuild it himself. When Russell declined the offer, appellant approached him "the next day or the day after, I'm not real sure" with another plan. This time appellant wanted him to "poke a hole in the gas heater" hose and light it so that when the house burned it would look like it was caused by "a faulty heater hose." Again Russell declined. Approximately two weeks later, while appellant was at home alone, the house burned and they collected about $80,-000 from the insurance company. The cause of the fire, as explained by appellant at that time, was that "he was putting verathane on the doors and he went into the garage to get something and when he came back inside the house was on fire." Shortly after the fire, appellant told Russell "I'm a miracle in disguise."

4. On Memorial Day week-end in 1982 after appellant and "the family" returned home from the lake, appellant "said he had numerous amounts of tools stolen from the home" for which he made a claim and received some $4,200 from the insurance company. Appellant's step-son, Scott, testified that many of the tools listed as stolen were never owned by appellant and the listed tools which appellant did own "start-ed showing up piece by piece and just started showing back up at the home."

5. There had never been any disagreements between Kingery and Russell or Howell and they got along well. Specifically, on the day and evening of the offense, there were no disagreements or arguments between them. When they left Austin they purchased a "six pack" of beer, but Kingery did not drink any of it and he was not intoxicated or drugged at the time of the shootings.

6. Jerry Redding, an inmate of the Burleson County jail at the same time appellant and Kingery were therein confined while awaiting trial, testified. He related how appellant and Kingery were confined in separate cells—each on opposite ends of the hallway. While he heard the two talking at various times, he specifically remembered one conversation one night when appellant "was really angry" with Kingery and told him "he had done a sloppy job and he had left the evidence there," talking about the gun. Further, he testified appellant told Kingery that he would help him after he got out "when he beat his case;" that "he could raise $10,000 within 24 hours after he got out" and that he knew Kingery was going back to the pen because his parole had been revoked and that he "would send him money for the commissary and goods in TDC." The witness further elaborated that appellant told Kingery "he was going to get some money from an insurance claim he had took out on the boy" and "he just told him to stay cool, he would help him all he could."

■ Appellant vigorously argues this evidence is insufficient to sustain the conviction. In making his argument, he is, in effect, making the same argument to us that he made to the jury. However, the jury must have believed the evidence presented by the state, and our duty is to view the evidence in the light most favorable to the jury verdict and determine whether any rational trier of fact could have found the essential elements of crime beyond a reasonable doubt. When we do this, we are convinced that a rational trier

of fact could have found that in an effort to extricate himself from the extreme financial bind he was in, appellant decided to kill his step-son and collect the insurance proceeds; that he arranged for Kingery to do the actual killing and that his part in the conspiracy was to secure the murder weapon and to lure his step-son to a desolate section of a rural county where the killing would occur. The testimony of Redding is, we think, of particular importance. While the statements he attributed to appellant do not amount to a confession, they amount to damning evidence of guilt, for if he were not guilty, why would he so speak of the attempted murder of his step-son? Based upon these facts, the appellant is guilty as a party to the offenses with which he was charged. Appellant's first ground is overruled.

In his second ground of error appellant contends "[t]he charge to the jury ... is fundamentally defective because it fails to adequately apply the abstract law of parties to the facts of the case." Appellant's position is that the trial court failed to include the culpable mental state "acting with intent to promote or assist commission of the offense" in the application section of the charge.

■ A jury charge is fundamentally defective when it:

(1) authorizes conviction without proof of an allegation in the indictment which is required to be proved;

(2) authorizes conviction on a different theory than alleged in the indictment;

(3) authorizes conviction on the theory alleged in the indictment and on additional unalleged theories;

(4) authorizes conviction for conduct which is not an offense.

*Jackson v. State,* 591 S.W.2d 820, 824 (Tex. Crim.App.1980).

■ In applying the law to the facts, the trial court stated:

*Now bearing in mind the foregoing instructions,* if you believe from the evidence beyond a reasonable doubt, that on or about the 18th day of February, 1983,

in the County of Burleson and State of Texas, Douglas Lloyd Kingery did then and there, intentionally and knowingly cause the death of an individual, John David Howell, by intentionally and knowingly shooting him with a shotgun and intentionally and knowingly beating him about the head with said shotgun, and if you further believe from the evidence beyond a reasonable doubt that on said date in said county and state, the Defendant, Clifton Wayne Fountain, *as a party as that term is hereinbefore defined,* solicited, encouraged, directed, aided or attempted to aid the said Douglas Lloyd Kingery in the foregoing action, you will find the said Clifton Wayne Fountain guilty of murder as charged in the indictment, but if you do not so believe, or if you have a reasonable doubt thereof, you will acquit the Defendant and say by your verdict "Not Guilty." (emphasis added).

(An identically worded charge, except applying the law of attempted murder to the facts, was given in the attempted murder case). Preceding this paragraph, the jury was given the following written instruction;

A person is criminally responsible ... if: *acting with intent to promote or assist* the commission of the offense, he solicits, encourages, aids or attempted to aid the other person to commit the offense. (emphasis added).

Viewing the charge as a whole, as we are required to do, and not being limited to the application paragraph alone, we find no fundamental error. "While the court should explicitly apply the law of parties to the facts of the case, in the absence of an objection or specifically requested charge no fundamental error is present." *Selvage v. State,* 680 S.W.2d 17 (Tex.Crim.App. 1984) citing *Bilbrey v. State,* 594 S.W.2d 754 (Tex.Crim.App.1980); *Romo v. State,* 568 S.W.2d 298 (Tex.Crim.App.1978). The second ground is overruled.

■ In his third ground of error, appellant contends the trial court erred in au-

thorizing the jury to convict appellant on theories not supported by the evidence, arguing there was no evidence to authorize the jury charge that appellant "aided or attempted to aid" Kingery. We disagree. Based upon the evidence presented, the jury could have believed appellant aided Kingery by purchasing the shotgun and luring the deceased and the victim to the alleged drug rendevous. This is some evidence to authorize the portion of the charge objected to. Appellant's third ground of error is overruled.

In his fourth and fifth grounds of error, appellant contends the trial court erred in admitting the testimony of Russell and Scott Hodde, respectively, "regarding extraneous offenses because this case does not fall into one of the exceptions to the general rule excluding evidence of extraneous offenses." The evidence of which he complains is that (1) appellant had expressed a desire to either have stolen or wrecked the 18 wheel truck in order to either collect insurance or be released from the obligation to pay for it; (2) appellant offered $1,000 to Russell to burn their home for the purpose of collecting insurance and the fact the home was subsequently damaged by fire, under questionable circumstances to say the least, and some $80,000 in insurance proceeds were collected, and (3) the "theft" of tools for which some $4,200 in insurance proceeds was received and that many of the tools were never owned by appellant and others allegedly stolen began reappearing.

■ The general rule in Texas, for which citation of authority is unnecessary, is that an accused may not be tried for some collateral crime or for being a criminal generally. Equally well recognized, however, is that

"[T]hese evidentiary principles, as most, must in some circumstances give way. For extraneous transactions constituting offenses shown to have been committed by the accused (note omitted) may become admissible upon a showing by the prosecution both that the transaction is relevant to a material issue in the case;

and, the relevancy value of the evidence outweighs its inflammatory or prejudicial potential." *Williams v. State*, 662 S.W.2d 344 (Tex.Crim.App.1983).

And, as stated by Judge McCormick therein, "[I]n a circumstantial evidence case, admissibility as part of the state's direct evidence depends on the transaction's relevance to a material issue which the state must prove." *Williams v. State*, 662 S.W.2d 344 (Tex.Crim.App.1983).

■ Whether appellant was guilty as a party to these offenses depended upon circumstantial evidence. Absent the complained of evidence there was absolutely no reason for appellant to have desired the death of his step-son. While it is true that it is not necessary for the prosecution to prove a motive for murder, if a motive is proveable, it certainly is relevant to a material issue which the state must prove—the guilt of the accused. We find the complained of evidence to be extremely relevant evidence of appellant's system, scheme or design, i.e.—his motive, and therefore proper. While this evidence did not directly prove appellant's participation as a party to the offense, it was relevant to show appellant's attitude toward collection of money on insurance claims; it placed in proper prospective the circumstances connecting appellant· to these offenses and made it more probable than not that appellant was a party to the instant offense. The trial court limited the jury's consideration of the evidence to the purpose for which it was offered. Since the evidence is more probative than prejudicial, we overrule appellant's fourth and fifth grounds of error.

■ In appellant's sixth ground of error, he contends "[t]he trial court erred by admitting ... the testimony of Arthur Scott Hodde regarding an extraneous offense, because his knowledge of the transaction was based on hearsay." The testimony about which appellant complains concerns the loss of the tools and the insurance recovery therefor. Scott Hodde, one of appellant's step-sons, testified that he was personally familiar (appellant having told

him at the time) of the "loss" of tools while the family was at the lake over Memorial Day weekend and the recovery from the insurance company of some $4,200. Appellant did not tell him and he was not personally familiar with the exact tools reported stolen. Either shortly before or during appellant's trial, the witness went to the insurance company office and obtained a photocopy of the list of tools reported stolen by appellant, a photocopy of appellant's statement concerning the loss and a photocopy of the check issued by the insurance company in payment of the claim. The witness testified that he recognized appellant's handwriting and that both the list and the statement concerning the loss were in appellant's handwriting. None of these exhibits were either offered in evidence before the jury nor were they referred to except to the extent that the witness was asked whether he "recently had an opportunity to observe a list of the tools that Sandy Fountain [appellant] indicated were missing;" to which he affirmatively answered. We do not agree that the witness' "knowledge of the transaction was based on hearsay" as contended by appellant.

Hodde had first hand knowledge of the alleged theft reported by appellant and knew that appellant collected for the alleged theft from the insurance carrier. Hodde was very familiar with appellant's tools and equipment. Hodde also recognized the handwritten document as being in the handwriting of appellant. We find that Hodde had sufficient first hand knowledge to testify. The facts in *Vanderbilt v. State*, 629 S.W.2d 709, 723–24 (Tex.Crim. App.1981), upon which appellant relies, are clearly distinguishable from the facts in the instant case. Appellant's sixth ground of error is overruled.

■ Appellant's last ground of error alleges the trial court erred in admitting into evidence a note written by Russell Hodde. We are faced with a record which leaves much to be desired. Appellant asserts in his brief that the complained of note (State's Exhibit 2) written by the injured

Russell while awaiting the arrival of the sheriff and the ambulance and reading:

Tell mom not to say anything to Sandy (my stepdad). He the one who did this to J.D. and me. Pls protect me he's crazy.

was admitted before the jury. Appellee contends in its brief "State's Exhibit 2 was never formally introduced into evidence or published to the jury." A search of the record reveals that while Russell was testifying before the jury, he identified the note which had been marked as Exhibit 2, and the prosecutor offered the exhibit into evidence. Appellant's counsel asked permission to "approach the bench;" there was an off-the-record discussion, and the court did not rule upon the offer. The next morning before the jury returned to the courtroom, appellant objected to the admission of State's Exhibit 2 and the court announced "[T]he court is going to admit the note with the limiting instruction to the jury." When the jury returned to the courtroom, the note was not again offered, nor did the judge ever rule upon the offer of evidence. In fact, a search of the record, even including the arguments to the jury, reveals that the note was never referred to again. An examination of the charge fails to disclose a limiting instruction which the court said it would give. The state, in its brief, asserts the limiting instruction was not given because the note was never exhibited to the jury. In this state of the record we cannot assume the note was ever received in evidence before the jury, and, accordingly, overrule appellant's seventh ground.

The judgment is affirmed.

ELLIS, Justice, dissenting.

Finding myself in disagreement with the other members of the panel, I would like to record my respectful dissent.

Clifton Wayne Fountain, appellant, appeals from two judgments of conviction, one for murder and the other for attempted murder. The jury assessed his punishment at forty (40) years on the murder and fifteen (15) years on the attempted murder.

Appellant challenges the sufficiency of the evidence to sustain the convictions.

Sufficiency of the evidence is measured by the standard enunciated by the United States Supreme Court in *Jackson v. Virginia,* 443 U.S. 307, 99 S.Ct. 2781, 61 L.Ed.2d 560 (1979): "Whether, after viewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." The preceding standard is employed in both direct and circumstantial evidence cases. *Houston v. State,* 663 S.W.2d 455 (Tex.Crim.App.1984); *Denby v. State,* 654 S.W.2d 457 (Tex.Crim.App.1983).

The indictment in the murder case alleged that appellant intentionally and knowingly caused the death of John David Howell by intentionally and knowingly shooting him with a shotgun and beating him about the head with said shotgun. The indictment in the attempted murder case alleged that the appellant intentionally shot Russell Wayne Hodde with a shotgun with the intent to commit the offense of murder.

The jury found appellant guilty as a party, in both cases, under Section 7.02(a)(2) of the Texas Penal Code, to the actual commission of the offenses by a person named Douglas Lloyd Kingery. Therefore, the evidence is sufficient to support the convictions only if a rational trier of fact, viewing the evidence in a light most favorable to the prosecution, could have found that Douglas Lloyd Kingery committed the offense as alleged in the indictment, and that appellant, acting with intent to promote or assist the commission of the offenses, solicited, encouraged, directed, aided, or attempted to aid Douglas Lloyd Kingery to commit the offenses. *Foster v. State,* 635 S.W.2d 710 (Tex.Crim.App.1982); Tex.Penal Code Ann. § 7.02(a)(2) (Vernon 1974).

Reviewing the facts in these cases I find that appellant was found guilty on circumstantial evidence presented by the State. Therefore the issue is whether the circumstances presented by the evidence established beyond a reasonable doubt that appellant acting with intent to assist or promote the murder and attempted murder, committed an act that solicited, encour-

aged, directed, aided or attempted to aid Kingery in his commission of these offenses. *Morrison v. State,* 608 S.W.2d 233 (Tex.Crim.App.1980).

The evidence in the cases shows that appellant was not present at the scene of the crime. There was no evidence that appellant solicited, encouraged, or aided Kingery prior to the commission of the offense. Although the evidence was overwhelming that Kingery shot Russell Hodde with a shotgun and also shot and killed John David Howell, the State failed to present any evidence to show that when Kingery committed the offenses, he did so at appellant's direction or due to his solicitation or encouragement. There is no evidence to establish that appellant had any knowledge of Kingery's intention to commit the offenses before they occurred. The State attempted to establish prior knowledge through Jerry Redding's testimony about conversations between appellant and Kingery while confined in jail after the offenses occurred. The State asked him leading questions to attempt to get him to testify that the conversations he overheard indicated in some way appellant's prior knowledge that the offenses would be committed. However, Redding testified instead that he never heard appellant say anything to indicate any collusion with Kingery in committing the offenses.

For the conviction, the State principally relied on evidence it presented to show a motive for appellant to engage in a conspiracy with Kingery to commit the offenses. This motive was appellant's financial bind and the coincidental existence of a $25,000.00 life insurance policy on Russell. Surely, evidence of a potential financial benefit to appellant resulting from the death of Russell Hodde would not provide a basis to convict him of participating in the offense committed by Kingery.

Every other reasonable hypothesis except guilt of appellant is not excluded by the evidence in this case. Therefore, I conclude that the evidence is not sufficient to show that appellant committed some act with intent to promote or assist the com-

mission of the attempted murder of Russell Hodde, or the murder of John David Howell by soliciting, encouraging, directing, aiding or attempting to aid Douglas Lloyd Kingery to commit these offenses. *See Morrison v. State, supra; Earnhart v. State,* 575 S.W.2d 551 (Tex.Crim.App.1979); *Wygal v. State,* 555 S.W.2d 465 (Tex.Crim. App.1977).

In cases where the evidence is insufficient to support a conviction, double jeopardy safeguards preclude further prosecution of the cause. *Burks v. United States,* 437 U.S. 1, 98 S.Ct. 2141, 57 L.Ed.2d 1 (1978); *Greene v. Massey,* 437 U.S. 19, 98 S.Ct. 2151, 57 L.Ed.2d 15 (1978).

I would reverse the convictions and remand the cases to the trial court with instructions to enter an order of acquittal.